# UNITED STATES *v.* MATLOCK

No. 72–1355.  Argued December 10–11, 1973—
Decided February 20, 1974

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 178. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 188.

*Deputy Solicitor General Wallace* argued the cause for the United States. On the brief were *Solicitor General Bork, Assistant Attorney General Petersen, Harry R. Sachse, Allan A. Tuttle,* and *Philip R. Monahan.*

*Donald S. Eisenberg,* by appointment of the Court, 412 U. S. 948, argued the cause and filed a brief for respondent.

MR. JUSTICE WHITE delivered the opinion of the Court.

In *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973), the Court reaffirmed the principle that the search of property, without warrant and without probable cause,

but with proper consent voluntarily given, is valid under the Fourth Amendment. The question now before us is whether the evidence presented by the United States with respect to the voluntary consent of a third party to search the living quarters of the respondent was legally sufficient to render the seized materials admissible in evidence at the respondent's criminal trial.

## I

Respondent Matlock was indicted in February 1971 for the robbery of a federally insured bank in Wisconsin, in violation of 18 U. S. C. § 2113. A week later, he filed a motion to suppress evidence seized by law enforcement officers from a home in the town of Pardeeville, Wisconsin, in which he had been living. Suppression hearings followed. As found by the District Court, the facts were that respondent was arrested in the yard in front of the Pardeeville home on November 12, 1970. The home was leased from the owner by Mr. and Mrs. Marshall. Living in the home were Mrs. Marshall, several of her children, including her daughter Mrs. Gayle Graff, Gayle's three-year-old son, and respondent. Although the officers were aware at the time of the arrest that respondent lived in the house, they did not ask him which room he occupied or whether he would consent to a search. Three of the arresting officers went to the door of the house and were admitted by Mrs. Graff, who was dressed in a robe and was holding her son in her arms. The officers told her they were looking for money and a gun and asked if they could search the house. Although denied by Mrs. Graff at the suppression hearings, it was found that she consented voluntarily to the search of the house, including the east bedroom on the second floor which she said was jointly occupied by Matlock and herself. The east bedroom was searched and the evidence at issue here, $4,995 in cash, was found in a diaper

bag in the only closet in the room.[1] The issue came to be whether Mrs. Graff's relationship to the east bedroom was sufficient to make her consent to the search valid against respondent Matlock.

The District Court ruled that before the seized evidence could be admitted at trial the Government had to prove, first, that it reasonably appeared to the searching officers "just prior to the search, that facts exist which will render the consenter's consent binding on the putative defendant," and, second, that "just prior to the search, facts do exist which render the consenter's consent binding on the putative defendant." There was no requirement that express permission from respondent to Mrs. Graff to allow the officers to search be shown; it was sufficient to show her authority to consent in her own right, by reason of her relationship to the premises. The first requirement was held satisfied because of respondent's presence in the yard of the house at the time of his arrest, because of Gayle Graff's residence in the house for some time and her presence in the house just prior to the search, and because of her statement to the officers that she and the respondent occupied the east bedroom.[2]

The District Court concluded, however, that the Government had failed to satisfy the second requirement and

---

[1] There were other seizures in the house and the east bedroom on November 12, but none of them is at issue here.

[2] Mrs. Graff was not advised that she had a right to refuse to consent to the search. The District Court expressed no view as to whether the absence of such advice would render her consent invalid, since it found that her consent, however voluntary, would not bind the respondent with regard to the search of his room. *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973), has since made clear, of course, that it is not essential for the prosecution to show that the consenter knew of the right to refuse consent in order to establish that the consent was voluntary.

had not satisfactorily proved Mrs. Graff's actual author-ity to consent to the search. To arrive at this result, the District Court held that although Gayle Graff's statements to the officers that she and the respondent occupied the east bedroom were admissible to prove the good-faith belief of the officers, they were nevertheless extrajudicial statements inadmissible to prove the truth of the facts therein averred. The same was true of Mrs. Graff's additional statements to the officers later on November 12 that she and the respondent had been sleep-ing together in the east bedroom regularly, including the early morning of November 12, and that she and respondent shared the use of a dresser in the room. There was also testimony that both Gayle Graff and respondent, at various times and places and to various persons, had made statements that they were wife and husband. These statements were deemed inadmissible to prove that respondent and Gayle Graff were married, which they were not, or that they were sleeping together .as a husband and wife might be expected to do. Having excluded these declarations, the District Court then con-cluded that the remaining evidence was insufficient to prove "to a reasonable certainty, by the greater weight of the credible evidence, that at the time of the search, and for some period of reasonable length theretofore, Gayle Graff and the defendant were living together in the east bedroom." The remaining evidence, briefly stated, was that Mrs. Graff and respondent had lived together in a one-bedroom apartment in Florida from April to August 1970; that they lived at the Marshall home in Pardeeville from August to November 12, 1970; that they were several times seen going up or down stairs in the house together; and that the east bedroom, which respondent was shown to have rented from Mr. and Mrs. Marshall, contained evidence that it was also lived in by

a man and a woman.[3]   The District Court thought these items of evidence created an "inference" or at least a "mild inference" that respondent and Gayle Graff at times slept together in the east bedroom, but it deemed them insufficient to satisfy the Government's burden of proof.   The District Court also rejected the Government's claim that it was required to prove only that at the time of the search the officers could reasonably have concluded that Gayle Graff's relationship to the east bedroom was sufficient to make her consent binding on respondent.

The Court of Appeals affirmed the judgment of the District Court in all respects. 476 F. 2d 1083.   We granted certiorari, 412 U. S. 917, and now reverse the Court of Appeals.

## II

It has been assumed by the parties and the courts below that the voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant, permitting evidence discovered in the search to be used against him at a criminal trial.   This basic proposition was accepted by the Seventh Circuit in this case, 476 F. 2d, at 1086, as it had been in prior cases,[4] and has generally been ap-

_____

[3] When the officers searched the east bedroom, two pillows were on the double bed, which had been slept in, men's and women's clothes were in the closet, and men's and women's clothes were also in separate drawers of the dresser.

[4] E. g., United States v. Stone, 471 F. 2d 170, 173 (1972), cert. denied, 411 U. S. 931 (1973); United States v. Wixom, 441 F. 2d 623, 624–625 (1971); United States v. Airdo, 380 F. 2d 103, 106–107, cert. denied, 389 U. S. 913 (1967).   Each of these cases cited with approval United States v. Sferas, 210 F. 2d 69, 74 (CA7), cert. denied sub nom. Skally v. United States, 347 U. S. 935 (1954), which expressed the rule "that where two persons have equal rights

plied in similar circumstances by other courts of appeals,[5] and various state courts.[6] This Court left open, in *Amos* v. *United States*, 255 U. S. 313, 317 (1921), the question whether a wife's permission to search the residence in which she lived with her husband could "waive his constitutional rights," but more recent authority here clearly indicates that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. In *Frazier* v. *Cupp*, 394 U. S. 731, 740 (1969), the Court "dismissed rather quickly" the contention that the consent of the petitioner's cousin to the search of a duffel bag, which was being used jointly by both men and had been left in the cousin's home, would not justify the seizure of petitioner's cloth-

---

to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either."

[5] *E. g., United States* v. *Ellis*, 461 F. 2d 962, 967–968 (CA2), cert. denied, 409 U. S. 866 (1972); *United States* v. *Cataldo*, 433 F. 2d 38, 40 (CA2 1970), cert. denied, 401 U. S. 977 (1971); *United States ex rel. Cabey* v. *Mazurkiewicz*, 431 F. 2d 839, 842–843 (CA3 1970); *United States* v. *Thompson*, 421 F. 2d 373, 375–376 (CA5), vacated on other grounds, 400 U. S. 17 (1970); *Gurleski* v. *United States*, 405 F. 2d 253, 260–262 (CA5 1968), cert. denied, 395 U. S. 981 (1969); *Wright* v. *United States*, 389 F. 2d 996, 998–999 (CA8 1968); *Roberts* v. *United States*, 332 F. 2d 892, 894–898 (CA8 1964), cert. denied, 380 U. S. 980 (1965); *United States* v. *Wilson*, 447 F. 2d 1, 5–6 (CA9 1971); *Nelson* v. *California*, 346 F. 2d 73, 77 (CA9), cert. denied, 382 U. S. 964 (1965); *Burge* v. *United States*, 342 F. 2d 408, 413 (CA9), cert. denied, 382 U. S. 829 (1965).

[6] *E. g., People* v. *Howard*, 166 Cal. App. 2d 638, 651, 334 P. 2d 105, 114 (1958); *People* v. *Gorg*, 45 Cal. 2d 776, 783, 291 P. 2d 469, 473 (1955); *People* v. *Haskell*, 41 Ill. 2d 25, 28–29, 241 N. E. 2d 430, 432 (1968); *People* v. *Walker*, 34 Ill. 2d 23, 27–28, 213 N. E. 2d 552, 555 (1966); *Commonwealth ex rel. Cabey* v. *Rundle*, 432 Pa. 466, 248 A. 2d 197 (1968); *State* v. *Cairo*, 74 R. I. 377, 385–386, 60 A. 2d 841, 845 (1948); *Burge* v. *State*, 443 S. W. 2d 720, 722–723 (Ct. Crim. App. Tex.), cert. denied, 396 U. S. 934 (1969).

ing found inside; joint use of the bag rendered the cousin's authority to consent to its search clear. Indeed, the Court was unwilling to engage in the "metaphysical subtleties" raised by Frazier's claim that his cousin only had permission to use one compartment within the bag. By allowing the cousin the use of the bag, and by leaving it in his house, Frazier was held to have assumed the risk that his cousin would allow someone else to look inside. *Ibid.* More generally, in *Schneckloth* v. *Bustamonte,* 412 U. S., at 245–246, we noted that our prior recognition of the constitutional validity of "third party consent" searches in cases like *Frazier* and *Coolidge* v. *New Hampshire,* 403 U. S. 443, 487–490 (1971), supported the view that a consent search is fundamentally different in nature from the waiver of a trial right. These cases at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[7]   The

---

[7] Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman* v. *United States,* 365 U. S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner* v. *California,* 376 U. S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

issue now before us is whether the Government made the requisite showing in this case.

## III

The District Court excluded from evidence at the suppression hearings, as inadmissible hearsay, the out-of-court statements of Mrs. Graff with respect to her and respondent's joint occupancy and use of the east bedroom, as well as the evidence that both respondent and Mrs. Graff at various times and to various persons had represented themselves as husband and wife. The Court of Appeals affirmed the ruling. Both courts were in error.

As an initial matter we fail to understand why, on any approach to the case, the out-of-court representations of respondent himself that he and Gayle Graff were husband and wife were considered to be inadmissible against him. Whether or not Mrs. Graff's statements were hearsay, the respondent's own out-of-court admissions would surmount all objections based on the hearsay rule both at the suppression hearings and at the trial itself, and would be admissible for whatever inferences the trial judge could reasonably draw concerning joint occupancy of the east bedroom. See 4 J. Wigmore, Evidence § 1048 (J. Chadbourn rev. 1972); C. McCormick, Evidence § 262 (2d ed. 1972).[8]

As for Mrs. Graff's statements to the searching officers, it should be recalled that the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissi-

---

[8] Rule 801 (d) (2) (A) of the proposed Federal Rules of Evidence, approved by the Court on November 20, 1972, and transmitted to Congress, expressly provides that a party's own statements offered against him at trial are not hearsay.

bility of evidence.[9] In *Brinegar* v. *United States,* 338 U. S. 160 (1949), it was objected that hearsay had been used at the hearing on a challenge to the admissibility of evidence seized when a car was searched and that other evidence used at the hearing was held inadmissible at the trial itself. The Court sustained the trial court's rulings. It distinguished between the rules applicable to proceedings to determine probable cause for arrest and search and those governing the criminal trial itself— "There is a large difference between the two things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them." *Id.,* at 173. That certain evidence was admitted in preliminary proceedings but excluded at the trial—and the Court thought both rulings proper—was thought merely to "illustrate the difference in standards and latitude allowed in passing upon the distinct issues of probable cause and guilt." *Id.,* at 174.

That the same rules of evidence governing criminal jury trials are not generally thought to govern hearings before a judge to determine evidentiary questions was confirmed on November 20, 1972, when the Court transmitted to Congress the proposed Federal Rules of Evidence. Rule 104 (a) provides that preliminary questions concerning admissibility are matters for

---

[9] *Bridges* v. *Wixon,* 326 U. S. 135, 153–154 (1945), upon which respondent and the Court of Appeals relied, involved the use of hearsay as substantive evidence bearing on the question of Bridges' membership in the Communist Party, a charge upon which a deportation order had been based. In addition to the fact that the use of unsworn, unsigned statements violated the rules of the Board of Immigration Appeals, the evidence was admitted to prove charges which directly jeopardized "the liberty of an individual," *id.,* at 154, and not for the purpose of determining a preliminary question of admissibility, as in this case.

the judge and that in performing this function he is not bound by the Rules of Evidence except those with respect to privileges.[10] Essentially the same language on the scope of the proposed Rules is repeated in Rule 1101 (d)(1).[11] The Rules in this respect reflect the general views of various authorities on evidence. 5 J. Wigmore, Evidence § 1385 (3d ed. 1940); C. McCormick, Evidence § 53, p. 122 n. 91 (2d ed. 1972). See also Maguire & Epstein, Rules of Evidence in Preliminary Controversies as to Admissibility, 36 Yale L. J. 1101 (1927).

Search warrants are repeatedly issued on *ex parte* affidavits containing out-of-court statements of identified and unidentified persons. *United States* v. *Ventresca,* 380 U. S. 102, 108 (1965). An arrest and search without a warrant were involved in *McCray* v. *Illinois,* 386 U. S. 300 (1967). At the initial suppression hearing, the police proved probable cause for the arrest by testifying to the out-of-court statements of an unidentified informer. The Government would have been obligated to produce the informer and to put him on the stand had it wanted to use his testimony at defendant's trial, but we sustained the use of his out-of-court statements at the suppression hearing, as well as the Govern-

---

[10] Rule 104 (a) provides:

"(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge, subject to the provisions of subdivision (b). In making his determination he is not bound by the rules of evidence except those with respect to privileges."

[11] Rule 1101 (d)(1) provides:

"Rules inapplicable. The rules (other than those with respect to privileges) do not apply in the following situations:

"(1) *Preliminary questions of fact.* The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the judge under Rule 104 (a)."

ment's refusal to identify him. In the course of the opinion, we specifically rejected the claim that defendant's right to confrontation under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment had in any way been violated. We also made clear that there was no contrary rule governing proceedings in the federal courts.

There is, therefore, much to be said for the proposition that in proceedings where the judge himself is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege, should not be applicable; and the judge should receive the evidence and give it such weight as his judgment and experience counsel.[12] However that may be, certainly there should be no automatic rule against the reception of hearsay evidence in such proceedings, and it seems equally clear to us that the trial judge should not have excluded Mrs. Graff's statements in the circumstances present here.

In the first place, the court was quite satisfied that the statements had in fact been made. Second, there is nothing in the record to raise serious doubts about the truthfulness of the statements themselves. Mrs. Graff harbored no hostility or bias against respondent that might call her statements into question. Indeed, she testified on his behalf at the suppression hearings. Mrs. Graff responded to inquiry at the time of the search that she and respondent occupied the east bedroom together. A few minutes later, having led the officers to the bedroom, she stated that she and respondent shared the one dresser in the room and that the woman's clothing in the

[12] "Should the exclusionary law of evidence, 'the child of the jury system' in Thayer's phrase, be applied to this hearing before the judge? Sound sense backs the view that it should not, and that the judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay." C. McCormick, Evidence § 53, p. 122 n. 91 (2d ed. 1972).

room was hers. Later the same day, she stated to the officers that she and respondent had slept together regularly in the room, including the early morning of that very day. These statements were consistent with one another. They were also corroborated by other evidence received at the suppression hearings: Mrs. Graff and respondent had lived together in Florida for several months immediately prior to coming to Wisconsin, where they lived in the house in question and where they were seen going upstairs together in the evening; respondent was the tenant of the east bedroom and that room bore every evidence that it was also occupied by a woman; respondent indicated in prior statements to various people that he and Mrs. Graff were husband and wife. Under these circumstances there was no apparent reason for the judge to distrust the evidence and to exclude Mrs. Graff's declarations from his own consideration for whatever they might be worth in resolving, one way or another, the issues raised at the suppression hearings.

If there is remaining doubt about the matter, it should be dispelled by another consideration: cohabitation out of wedlock would not seem to be a relationship that one would falsely confess. Respondent and Gayle Graff were not married, and cohabitation out of wedlock is a crime in the State of Wisconsin.[13] Mrs. Graff's statements were against her penal interest and they carried their own indicia of reliability. This was sufficient in itself, we think, to warrant admitting them to evidence for consideration by the trial judge. This

---

[13] Wis. Stat. § 944.20 (1971) provides:

"Whoever does any of the following may be fined not more than $500 or imprisoned not more than one year in county jail or both: . . . (3) Openly cohabits and associates with a person he knows is not his spouse under circumstances that imply sexual intercourse."

is the case even if they would be inadmissible hearsay at respondent's trial either because statements against penal interest are to be excluded under *Donnelly* v. *United States,* 228 U. S. 243, 272–277 (1913), or because, if Rule 804 (b) (4) of the proposed Federal Rules of Evidence becomes the law, such declarations would be admissible only if the declarant is unavailable at the time of the trial.

Finally, we note that Mrs. Graff was a witness for the respondent at the suppression hearings. As such, she was available for cross-examination, and the risk of prejudice, if there was any, from the use of hearsay was reduced. Indeed, she entirely denied that she either gave consent or made the November 12 statements to the officers that the District Court excluded from evidence. When asked whether in fact she and respondent had lived together, she claimed her privilege against self-incrimination and declined to answer.

## IV

It appears to us, given the admissibility of Mrs. Graff's and respondent's out-of-court statements, that the Government sustained its burden of proving by the preponderance of the evidence that Mrs. Graff's voluntary consent to search the east bedroom was legally sufficient to warrant admitting into evidence the $4,995 found in the diaper bag.[14] But we prefer that the District Court

---

[14] Accordingly, we do not reach another major contention of the United States in bringing this case here: that the Government in any event had only to satisfy the District Court that the searching officers reasonably believed that Mrs. Graff had sufficient authority over the premises to consent to the search.

The Government also contends that the Court of Appeals imposed an unduly strict standard of proof on the Government by ruling that its case must be proved "to a reasonable certainty, by the great weight of the credible evidence." But the District Court required only that the proof be by the *greater* weight of the evidence and the

178

first reconsider the sufficiency of the evidence in the light of this decision and opinion. The judgment of the Court of Appeals is reversed and the case is remanded to the Court of Appeals with directions to remand the case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Respondent William Matlock has been indicted for robbing a federally insured bank in violation of 18 U. S. C. § 2113. The issue in this case involves the suppression of money found in a closet in Matlock's bedroom during a warrantless search of the home in which he lived. The search of the home, and of the bedroom, was authorized by one Gayle Graff, and the Court now remands this case for the District Court to determine, in the light of evidence which that court had previously excluded, whether Mrs. Graff was in fact a joint occupant of the bedroom with sufficient authority to consent to the search. Because I believe that the absence of a search warrant in this case, where the authorities had opportunity to obtain one, is fatal, I dissent from that disposition of this case.

The home which was searched was rented by one William Marshall, and was occupied by members of his

Court of Appeals merely affirmed the District Court's judgment. There was an inadvertence in articulating the applicable burden of proof, but it seems to have been occasioned by a similar inadvertence by the Government in presenting its case. In any event, the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. See *Lego* v. *Twomey,* 404 U. S. 477, 488–489 (1972). We do not understand the Government to contend that the standard employed by the District Court was in error, and we have no occasion to consider whether it was.

family, including his wife and his 21-year-old daughter Gayle Graff. Respondent Matlock paid the Marshalls for the use of a bedroom in the home, which he apparently occupied with Gayle Graff. Respondent was arrested in the yard of the home on the morning of November 12, 1970. He offered no resistance, and was restrained in a squad car a distance from the home. Immediately thereafter, officers walked to the home, where Mrs. Graff was present. The officers told her they were searching for guns and money, and asked her whether Matlock lived in the home. After being asked by the officers whether they could search the house, and without being told that she could withhold her consent, Mrs. Graff permitted a police search.

During this first search, three officers entered the house. One of the officers testified that they walked through the kitchen, pantry area, front porch, and living room. The officers asked which bedroom was Matlock's. After Mrs. Graff had indicated the second-floor bedroom which she and Matlock occupied and permitted its search, the officers found a diaper bag half full of money in the bedroom closet. The admissibility of this evidence is involved in the instant case.

The officers left the home, but returned a few minutes later for a second search. This time, they found certain other incriminating items in the pantry area. A third search was made in the afternoon. Again, the officers did not secure a warrant to search the home, but waited for an officer to bring Mrs. Marshall home, at which point they secured her consent to a search. Four officers participated in this search, which discovered further evidence downstairs and in a dresser in Matlock's bedroom.

At no time did the officers participating in any of the three searches, including the first search involved in this case, attempt to procure a search warrant from a judicial officer. The District Court, in a finding which the Gov-

ernment does not challenge, found that there was no exigent circumstance or emergency which could provide an excuse for the Government officers' failure to secure a warrant to invade the security of the Marshall home:

"At no time on November 12, 1970, was a search warrant obtained by any law enforcement officers for the purpose of conducting a search of the Marshall home. There was adequate time to obtain one or more warrants. There was no emergency, nor danger to any police officer or other persons which required that the search proceed without awaiting the time at which a search warrant could be applied for. The search of the house was not incidental to the arrest of the defendant."

This, I believe, is the crucial finding in the case, rather than the ultimate resolution of the question of Gayle Graff's "authority" to consent to the search. This search is impermissible because of the failure of the officers to secure a search warrant when they had the opportunity to do so.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The judicial scrutiny provided by the second clause of the Amendment is essential to effectuating the Amendment, and if, under that clause a warrant could have been obtained but was not, the ensuing search is "unreasonable" under the Amendment.[1] The intervention of a judicial

---

[1] The second clause of the Fourth Amendment lays down exacting standards for the issuance of a valid search warrant. The Court,

officer gives the Amendment vitality by restraining unnecessary and unjustified searches and invasions of privacy before they occur.  At the same time, a written

however, in effect reads the provision of the first clause of the Amendment proscribing "unreasonable" searches and seizures to allow it to create classes of judicially sanctioned "reasonable" searches, even when they do not comport with the minimum standards which a warranted search must satisfy.  But the history of the Amendment indicates that the Framers added the first clause to give additional protections to the people beyond the prescriptions for a valid warrant, and not to give the judiciary carte blanche to later dilute the warrant requirement by sanctioning classes of warrantless searches.

The form of oppressive search and seizure best known to the colonists was the general warrant, or general writ of assistance, which gave the officials of the Crown license to search all places and for everything in a given place, limited only by their own discretion. See *Warden* v. *Hayden*, 387 U. S. 294, 313–317 (DOUGLAS, J., dissenting).  It was this abuse which James Otis condemned in Boston in 1761, see 2 J. Adams, Works 523–525, and which Patrick Henry condemned as Virginia debated the new Constitution in 1788.  See 3 J. Elliot, Debates 448.  Because the Crown had employed the general warrant, rather than the warrantless search, to invade the privacy of the colonists without probable cause and without limitation, it is not surprising that the hatred of the colonists focused on it.

But in concentrating their invective on the general warrant, the colonists and the Framers did not intend to subject themselves to searches without warrants.  We begin with James Otis.  In his 1761 speech, Otis not only condemned the general warrant, he also envisioned an acceptable alternative.  This was not the search without a warrant, but rather searches under warrants confined by explicit restrictions: "I admit that special writs of assistance, to search special places, may be granted to certain persons on oath." 2 J. Adams, Works 524.

In 1778, during debates on the Constitution prior to passage of the Bill of Rights, Virginia recommended for congressional consideration a series of amendments to the Constitution, one of which guaranteed the security of the citizenry against unreasonable Government searches.  This proposed amendment quite clearly presupposed that an "unreasonable" search could be avoided only by

warrant helps ensure that a search will be limited in scope to the areas and objects necessary to the search because both the "place to be searched" and the "things to be seized" must be described with particularity. We have

<hr>

use of a warrant, and only if that warrant met certain standards. It did not conceive of warrantless searches:

"That every freeman has a right to be secure from all unreasonable searches and seizures of his person, his papers, and property; all warrants, therefore, to search suspected places, or seize any freeman, his papers, or property, without information on oath (or affirmation of a person religiously scrupulous of taking an oath) of legal and sufficient cause, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend any suspected person, without specially naming or describing the place or person, are dangerous, and ought not to be granted." 3 J. Elliot, Debates 658.

Accordingly, when the First Congress convened, James Madison of Virginia officially proposed amendments to the Constitution, including one restricting searches and seizures. Like the original Virginia recommendation, it was nurtured by a fear of the general warrants, and emphasized the warrant requirement:

"The rights of the people to be secured in their persons, their houses, their papers, and their other property, from all unreasonable searches and seizures, shall not be violated by warrants issued without probable cause, supported by oath or affirmation, or not particularly describing the places to be searched, or the persons or things to be seized." 1 Annals of Cong. 434–435.

After being referred to the Committee of Eleven, the amendment was returned to the floor of the House, where it was approved after amendment in a form which closely followed Madison's original proposal, and with its thrust still focusing on the warrant requirement: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated by warrants issuing without probable cause, supported by oath or affirmation, and not particularly describing the place to be searched and the persons or things to be seized." *Id.*, at 754.

Only at this point was the present form of the Amendment, with its two distinct clauses, first suggested. Mr. Benson of New York, chairman of a Committee of Three to arrange the amendments, proposed that "by warrants issuing" be changed to "and no warrant shall issue." His purpose was to *strengthen* the Amend-

therefore held that only the gravest of circumstances could excuse the failure to secure a properly issued search warrant.

Up to now, a police officer had a duty to secure a warrant when he had the opportunity to do so, even if substantial probable cause existed to justify a search. In *Johnson* v. *United States,* 333 U. S. 10, decided in 1948, police officers smelled the unmistakable odor of opium outside a hotel room. They knocked on the door, identified themselves, and told the occupant that they wanted to talk to her. The occupant stepped back acquiescently and admitted the officers. We found that the entry was granted in submission to authority, and

---

ment, not to license later judicial efforts to undercut the warrant requirement:

"Mr. Benson objected to the words 'by warrants issuing.' This declaratory provision was good as far as it went, but he thought it was not sufficient; he therefore proposed to alter it so as to read 'and no warrant shall issue.'" *Ibid.*

Benson's amendment was defeated at that point, *ibid.,* but when the Committee of Three returned the amendment to the House, it followed the form suggested by Benson. The prohibition against unreasonable searches was made explicit in a separate clause, and a second clause began with the words earlier proposed by Benson. This form was then accepted, *id.,* at 779, and the Senate concurred. Senate Journal, Aug. 25, 1789. See generally N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 97–103.

The history of the separate clause prohibiting unreasonable searches and seizures demonstrates that it was created in an effort to strengthen the prohibition of searches without proper warrants and to broaden the protections against unneeded invasions of individual privacy. See *id.,* at 103; *Warden* v. *Hayden,* 387 U. S., at 317–318 (DOUGLAS, J., dissenting). It perverts the intent of the Framers to read it as permitting the creation of judicial exceptions to the warrant requirement in all but the most compelling circumstances. See J. Landynski, Search and Seizure and the Supreme Court 42–44.

that the odors alone would not justify the search without a warrant, despite the fact that they would have provided probable cause for a warrant. Since, as in the instant case, no "exceptional circumstances" [2] were cited which might have justified the warrantless search, but only "the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate," *id.*, at 14, 15, we found the warrantless search unconstitutional. Mr. Justice Jackson explained for the Court the need for judicial intervention as a restraint of police conduct before a search was made; and what he said is applicable today:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer,

---

[2] By way of illustration, we observed: "No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear." 333 U. S., at 15.

not by a policeman or government enforcement agent." *Id.,* at 13–14.

In *Trupiano* v. *United States,* 334 U. S. 699, also decided in 1948, there was a search of an illegal distillery made without a warrant, even though the agents who conducted the search had ample information and time within which to secure a search warrant. Since there was no reason but the convenience of the police which could justify the warrantless search, we found it unreasonable. The police, when not constrained by the limitations of a warrant, are free to rummage about in the course of their search. "[T]hey did precisely what the Fourth Amendment was designed to outlaw. . . . Nothing circumscribed their activities on that raid except their own good senses, which the authors of the Amendment deemed insufficient to justify a search or seizure except in exceptional circumstances not here present." *Id.,* at 706–707. Speaking through Mr. Justice Murphy we explained again the reasons for our insistence on adherence to constitutional processes:

"This rule rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such ·activities. . . . In their understandable zeal to ferret out crime and in the excitement of the capture of a suspected person, officers are less likely to possess the detachment and neutrality with which the constitutional rights of the suspect must be viewed. To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible. And subsequent history has confirmed the wisdom of that requirement." *Id.,* at 705.

Likewise, in *McDonald* v. *United States,* 335 U. S. 451, also decided in 1948, officers with probable cause to engage in a search failed to secure a warrant, and we found the search illegal. Officers had heard an adding machine, frequently used in numbers operations, when outside a rooming house. Entering the house through a window, they looked over the transom of McDonald's room and saw gambling paraphernalia. They shouted to McDonald to open his room, and he did so. Again, there was no grave emergency which alone could justify the failure to secure a warrant, *id.,* at 455, and again we patiently reiterated the reasons for our insistence that the police submit proposed searches to prior judicial scrutiny whenever feasible:

> "We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home." *Id.,* at 455–456.

*Jones* v. *United States,* 357 U. S. 493, decided in 1958, provides yet another instance of our recognition of the importance of adherence to judicial processes. Federal alcohol agents had secured a warrant to search a home during the daytime, having observed substantial evidence

that illegal liquor was being produced. Rather than executing the warrant, they waited until the evening, when they entered and searched the home. We held, specifically through Mr. Justice Harlan, that probable cause to believe that the house contained contraband was not sufficient to legitimize a warrantless search: "Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." *Id.*, at 498.

And, indeed, the provisions of the Fourth Amendment carefully and explicitly restricting the circumstances in which warrants can issue and the breadth of searches have become "empty phrases," when the Court sanctions this search conducted without any effort by the police to secure a valid search warrant. This was not a case where a grave emergency, such as the imminent loss of evidence or danger to human life, might excuse the failure to secure a warrant. Mrs. Graff's permission to the police to invade the house, simultaneously violating the privacy of Matlock and the Marshalls, provides a sorry and wholly inadequate substitute for the protections which inhere in a judicially granted warrant. It is inconceivable that a search conducted without a warrant can give more authority than a search conducted with a warrant. See *United States* v. *Lefkowitz,* 285 U. S. 452, 464. But here the police procured without a warrant all the authority which they had under the feared general warrants, hatred of which led to the passage of the Fourth Amendment. Government agents are now free to rummage about the house, unconstrained by anything except their own desires.[3] Even after finding items

---

[3] For an example of the abuse to which a warrantless search is subject, see *Kremen* v. *United States,* 353 U. S. 346, where the police gutted a home during a warrantless search.

which they may have expected to find and which doubtless would have been specified in a valid warrant, see *Coolidge* v. *New Hampshire,* 403 U. S. 443, 471, they prolonged their exploratory search in pursuit of additional evidence. The judgment of whether the intrusion into the Marshalls' and Matlock's privacy was to be permitted was not made by an objective judicial officer respectful of the exacting demands of the Fourth Amendment; nor were the police limited by the need to make an initial showing of probable cause to invade the Marshall home. Since the Framers of the Amendment did not abolish the hated general warrants only to impose another oppressive regime on the people, I dissent.

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, dissenting.

I would not limit the remand to the determination whether Mrs. Graff was in fact a joint occupant of the bedroom with sufficient authority to consent to the search. In my view the determination is also required that Mrs. Graff consented knowing that she was not required to consent. "It wholly escapes me how our citizens can meaningfully be said to have waived something as precious as a constitutional guarantee without ever being aware of its existence." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 277 (1973) (Brennan, J., dissenting). I would hold that an individual cannot effectively waive this right if he is totally ignorant of the fact that, in the absence of his consent, such invasions of privacy would be constitutionally prohibited.