THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* BERNICE GLASS *et al.*, Defendants-Appellees.

First District (3rd Division)    Nos. 76-1507 through 76-1510 cons.

Opinion filed January 18, 1978.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Dean S. Wolfson, Lawrence J. Suffredin, Jr., and Francis E. Andres, all of Chicago, for appellees.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:
Pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1975, ch. 110A, par. 604(a)(1)), the State appeals from an order of the Circuit Court of Cook County suppressing physical evidence seized in the course of police investigations which led to the arrest of the defendants on charges of theft of property exceeding $150 in value. (Ill. Rev. Stat. 1975, ch. 38, par. 16—1.) The State argues that the evidence was seized as the result of a valid consent to enter and search the premises wherein the alleged stolen property was located and, in the alternative, argues that defendants Glass, Dickson and Wisch are without standing to contest the validity of the seizure. In response to these arguments, the defendants contend that the consent to enter was without authority and that the State has waived the standing issue by failing to raise it before the Circuit Court of Cook County.

The testimony received at the hearing on the motion to suppress, which was filed on behalf of the defendant Bordenaro and joined in by the other defendants, reveals the following factual situation. On June 9, 1976, investigator George Mays of the Chicago Police Department had a discussion with an unknown informant. The informant told Mays that on June 2, 1976, a load of Crisco oil, and on June 7, 1976, a load of Zest soap were stolen. The informant indicated that these items, along with a load of stolen Bounce and Tide, were being stored in a white warehouse building located at 300 Maple Street, Joliet, Illinois, belonging to C & C Trucking, owned by a man named Silverman. The informant did not know where the products (all manufactured by Proctor and Gamble, Inc.) had come from, but he indicated that they were to be purchased by

a man named "Tony." Mays was not able to determine if any of these products had, in fact, been stolen.

On June 10, 1976, Mays and his partner proceeded to Joliet to investigate. After verifying the location, description and name of the warehouse, the officers went to the Joliet Police Department and spoke with Chief of Detectives Martinson and Detective Pasvan concerning the information about the stolen products. Pasvan told Mays that he knew Douglas Silverman, the owner of the warehouse premises, and that Silverman was a legitimate businessman. Pasvan suggested that they go directly to Silverman and inform him of the suspected thefts and of the information which located the products on his premises.

Mays, his partner, and Pasvan next proceeded to the C & C Trucking location, where they spoke with Silverman and identified themselves as police officers. Silverman informed the officers that Tide was being unloaded from a truck in "building No. 3." Silverman offered to show the premises to the officers and he conducted them to building No. 3 (also referred to as building No. 8 in the course of Silverman's testimony) which is a partitioned warehouse. Silverman indicated that he had leased the west portion of building No. 3 to the defendant Tony Bordenaro for two months at a rent of $150 per month. With his own key Silverman unlocked the door to the larger east portion of the building which contained a loading dock. A truck, which was parked at the dock, was visible from the outside of the building. Upon entry, the officers observed a trailer load of Tide, partially unloaded. Approximately three skids of the detergent had already been removed from the trailer and placed in building No. 3.

While Silverman and the officers were inside the building, Bodenaro was located by other officers outside; he was placed under arrest and advised of his rights. After he was brought inside, Bordenaro was asked, "Where's the Crisco Oil?" Bordenaro replied that it was in "the next building."

Silverman testified that Bordenaro had exclusive use of the west portion of building No. 3 and access to the east portion under the terms of the lease agreement. Silverman would allow use of the east portion to unload merchandise and, if a tenant requested, Silverman could be hired to use his forklift for unloading merchandise. At the time of the seizure, Silverman had given Bordenaro permission to use the dock area (east portion) in accordance with the lease agreement. Silverman had not been requested to help with the unloading. The east portion was kept locked by Silverman, who possessed the keys, and access was allowed to Bordenaro, as well as other tenants, only upon notification to Silverman's office, located on the grounds but in another building. Silverman's

testimony further indicated that the east portion of building No. 3 was also used by him for the storage of his own goods.

■■■ In granting the motion to suppress the evidence seized from building No. 3, the Circuit Court stated:

"I think for the purposes of the record may or may not have been adequate bases to have gotten a warrant, I don't think Silverman was in a position to surrender Bordinaro's [sic] Constitutional rights. I don't think it was a valid property surrender of Bordenaro's Constitutional rights to be protected from unreasonable search and seizure.* * *"

It is our opinion that the evidence does not support this analysis, for it depends upon the erroneous conclusion that Bordenaro had exclusive possession of the east portion of the building at the time of the officers' entry. The circumstances of this case clearly support the State's position that Silverman had equal, if not superior, authority over the premises involved, and that his voluntary consent to the officers' presence in the east portion of building No. 3 removed the search and seizure from any expectation of privacy to which Bordenaro was entitled under the Constitution. (*United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24.) Furthermore, since the evidence seized from "the next building" was suppressed as a result of the court's incorrect characterization of the seizure of the Tide, that evidence was also lawfully seized pursuant to information received from Bordenaro following his arrest.

Since we hold that the evidence was lawfully seized, we do not address the issue with respect to the standing of defendants Glass, Dickson and Wisch to join in the motion to suppress. The order of the Circuit Court of Cook County granting the motion to suppress is reversed with respect to each of the defendants, and these causes are remanded for further proceedings consistent with this opinion.

Reversed and remanded.

JIGANTI, P. J., and SIMON, J., concur.