OPINION
Christopher Trent was indicted for the murder and aggravated robbery of Maurice Hilsman. After an adverse ruling on his motion to suppress evidence, Trent entered no contest pleas to involuntary manslaughter and aggravated robbery. The trial court made findings of guilty and imposed consecutive sentences of 10 and 8 years for an aggregate sentence of 18 years. Trent advances two assignments of error on appeal.
1. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS.
During the course of investigating the Hilsman homicide, the Dayton police went to a crack house at 439 Huffman Avenue in east Dayton on June 20, 1998. The police looked through a window and observed Trent, who appeared to be badly injured. The police obtained entry after receiving permission to enter from Angela Domm, an occupant of the premises. Trent told the police he had been beaten and named his assailants. The police arrested the assailants, who were in the house. The police searched the house for evidence of the assault on Trent. Trent refused medical treatment and refused to press charges against the assailants. On June 27, Trent flagged down the police in the vicinity of Huffman Avenue and Findley Street and offered to tell them about the Hilsman homicide. He was taken to police headquarters in downtown Dayton where he was interviewed at about 3:00 p.m. and gave the first of two videotaped statements. After the first videotaped statement was completed, the police were returning Trent to 439 Huffman Avenue when Trent made certain statements that were inconsistent with his prior statements. The police returned Trent to police headquarters and Mirandized him at 4:55 p.m. Trent gave a second videotaped statement at 6:15 p.m. The following day, the police returned to 639 Huffman Avenue and obtained the permission of the landlord, Daisy Rogers, to search the premises.
The trial court rendered a comprehensive thirty-seven page decision in overruling Trent's motion to suppress. Because the trial court's detailed narration of the evidence is not questioned on appeal, and because the trial court's decision contains a thorough analysis of the evidence, in the interest of judicial economy we will make ample use of the trial court's decision in disposing of this assignment.
Trent first argues under this assignment that the police were obliged to advise him of his Miranda rights prior to speaking with him and taking the first videotaped statement from him on July 27, 1998. The initial discussion between Trent and the police on July 27, 1998, which culminated with the first videotaped statement on that date, was initiated by Trent when he flagged down two police officers who were investigating the Hilsman homicide. This initial discussion and first videotaped statement were exculpatory. The trial court concluded that Miranda warnings were not required as to the initial discussion and first videotaped statement as follows:
 "Miranda warnings" are only required prior to a "custodial interrogation" when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way." State v. Woodward (Oct. 17, 1994), Warren App. No. CA94-04-046, unreported citing Miranda, supra. The warnings are not required simply because questioning takes place in a station house or the person questioned is a criminal suspect. State v. Woodward (October 17, 1994), Warren App. No. CA 94-04-046, unreported citing Oregon v. Mathiason
(1977), 429 U.S. 492, 495. A suspect is entitled to an explanation of his constitutional rights only when there is a restraint on freedom of movement of the degree generally associated with a formal arrest. State v. Woodward, supra, citing California v. Beheler (1983), 463 U.S. 1121, 1125. See also State v. Torres (1990), 67 Ohio App.3d 268 and State v. Uhler (1992), 80 Ohio App.3d 113.
 Trent's initial exculpatory July 27 statement was given to the police under the following circumstances: It was Trent, not the police, who initiated the conversation. Det. Burke and Sgt. White were driving their car when they were flagged down by Trent. Trent approached the car, inquired whether there had been any arrests for the murder of Maurice Hillsman [sic], and said, "I can tell you all about what happened." Suppression Transcript. Trent agreed to go to the Safety Building with the officers, but said that "he didn't want anybody to know what was going on." Id. He agreed to undergo a fake weapons frisk, and he was placed in the police car, although he was not handcuffed. He was interviewed at the police department, not as a suspect, but as a potential witness. After he provided an exculpatory statement in which he said that he had witnessed "Dewey" and "Slaughter" and "New York" commit the murder, he was placed back into a police car to be returned to 639 Huffman.
 Under the totality of these circumstances, this Court finds that the State has proven by a preponderance of the evidence that Trent was not in custody during his first July 27 interview and while in the police car being returned to 639 Huffman; that his freedom of action was not deprived in any significant manner; and that no reasonable person in Trent's circumstances would have believed that he was in custody during that period of time. Inasmuch these statements were not the product of a custodial interview, the Miranda rule need not have been satisfied by the police.
The record supports the trial court's discussion of the evidence and determination that Miranda warnings were not required because Trent's initial discussion with the police and first videotaped statement were not the product of custodial interrogation, as Trent contends.
After giving the first videotaped statement, Trent was being driven back to 437 Huffman Avenue by one of the investigating officers and Det. Elzholz, another Dayton detective, when Trent made statements that were inconsistent with his first videotaped statement. Trent was returned to the Dayton Police Department in downtown Dayton where he was advised of his Miranda rights, acknowledged his understanding of those rights, and executed a rights waiver. Thereafter, Trent made an inculpatory statement that was videotaped. Trent contends that his waiver of rights was neither intelligent or voluntary. A psychologist, Dr. Daniel Barna, provided expert testimony to that effect. The trial court determined that Trent's rights waiver was both intelligent and voluntary, discussing the evidence as follows:
 Trent has 5th grade reading skills and 4th grade reading comprehension skills; his full scale IQ is 68 (mental retardation under DSM-4); and he was cocaine dependent on July 27. However, in accessing Trent's intellectual capacity to waive the Miranda rights and provide a voluntary statement to the police, this Court must also consider the other facts and circumstances established in the evidence:
 First, Trent was capable of performing the security functions a [sic] "door man" at a drug house, with the responsibility of distinguishing "legitimate customers" from the police.
 Second, he monitored the status of the police homicide investigation and had the intellectual wherewithal to volunteer an exculpatory statement to Det. Burke on July 27.
 Third, while Trent was cocaine-dependent, that drug addiction did not seem to impair his rationality on July 27, as his videotaped statements on that day demonstrate. During both recorded interviews, Trent appeared relaxed, used his hands in a gesticulative manner, and was completely intelligible. He responded to the questions posed to him in a logical manner; and he provided lengthy, detailed, coherent versions of the Hilsman homicide. Furthermore, there is no evidence that the police attempted to exploit Trent's cocaine dependence in an effort to extract a confession.
 Fourth, when Dr. Barna read to Trent the Miranda rights from a blank form, many of Trent's responses were indicative of an understanding of the rights. Regarding the right to remain silent, Trent told Barna that it meant "I don't have to say nothing." Suppression Transcript. Regarding the warning that "anything you say can and will be used against you in a court of law," Trent explained, "So if I say anything to the police they or anybody can use it against me . . . If I tell the truth, they can reword everything I say and make it look like I'm the bad guy. . . . if I lie to anybody, they can hold it against me. They think I had something to do with it. The way I take it, that's if I do say something, then I can have it held against me." Id.
Regarding the right to talk to a lawyer before and during any questioning, Trent told Barna, "I have the right to talk to a lawyer, yeah. If the detectives ask, they told me to read my rights. Then I have a choice. I can get a lawyer. I told them but they wouldn't let me get a lawyer. That means I can have a lawyer sitting right there but they wouldn't let me have one. That's all I can tell you about that one." Id. Regarding the right to have an appointed lawyer at no cost to himself, Trent told Barna, "That means if I was getting questioned again by the detective, I would demand a lawyer like I did before and they wouldn't let me have one. That's all I know in my own words." Id. Regarding the right to stop answering questions at any time until he could talk to a lawyer, Trent told Barna, "I didn't want to talk to the police until they made me talk to him or `em or them. They told me that if I give `em or them a statement, they said they would help me get to a place where I wouldn't be killed. They didn't say nothing at first about jail. And I asked `em or them for a lawyer and they wouldn't give me one. Id. (With specific regard to Trent's claim to Barna that he demanded and was denied an attorney, Trent was not truthful to Barna. This Court has found credible the testimony of Detectives Martin and Elzholz that at no time before or during either July 27 interview did Trent ask request an attorney or indicate that he did not want to talk to the police).
 Fifth, Trent's oral and written statements associated with his three prisoner grievances reveal that he is a person who does not fall within the category of mentally retarded individuals who Dr. Barna described "tend to acquiesce." Id. On the contrary, he appears to be an individual who is aware that he has rights, and who can and did adamantly insist upon the protection of those rights. In particular, Trent's October 28 grievance demonstrates that he has an acute understanding of the right of counsel. As he handed the completed five-page grievance to Corrections Officer Wheeler, insisted that he be give [sic] a copy to provide his attorney and to a television station. Furthermore, in the written grievance itself, Trent makes repeated references to contacting his lawyer: " . . . So I called my attorney and mom and they are going to do something about this . . . So I'm putting the rest on paper and my attorney is going to do something about this . . . I was in the right this time and I'm going to talk to my attorney about this and belive [sic] me somethin [sic] is going to be done and I'm going to run off copys [sic] of this so TV 2 will see how you are treating people." State's Exh. #5.
 Sixth, Det. Martin read the Miranda form, State's Exh. #2, in its entirety to Trent, including all five Miranda rights. After each right was read, Trent was asked if he understood the right, to which he verbally "yes" five times. After all five rights were read, Martin "told him, Chris, I've read each one of these to you. If you understand, what I'd like you to do is put your initials next to each one of these. If you don't understand, I'd be glad to explain it to you." Suppression Transcript. Trent responded by looking at the form and placing his initials "CT" to the left of all five rights. Martin then read to Trent the waiver paragraph: "The above statement of rights has been read to me. I understand what my rights are. I'm willing to make a statement and answer questions. I do not have a lawyer at this time. I understand and know what I'm doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." State's Exh. #2. At no time did Trent indicate to Martin that he had any difficulty in comprehending or understanding what was being read to him.
 Seventh, during neither interview on July 27 was Trent subjected to police coercion (psychological or otherwise), threats, mistreatment or physical deprivation.
 The facts of the case at bar should be compared to those of State v. Dailey, supra, decided by the Ohio Supreme Court in 1990. In Dailey, expert testimony established that Dailey was mildly retarded with a general I.Q. of 71, that his word identification level was at the 1.8 grade level, and that his reading comprehension was below the third grade level. Such a defendant, the Supreme Court held, is capable of knowingly waiving the Miranda rights and providing a voluntary statement to the police, as long as the defendant is not physically or psychologically pressured by the police. Trent's intellectual capacity seems to be greater than that of the defendant in Dailey in that Trent's reading skills are at the 5th grade level, and he reads with 4th grade reading comprehension (vs. 1.8 grade word identification and third grade reading comprehension in Dailey). Furthermore, Trent was not subjected to any police coercion.
 Under the totality of the circumstances, this Court finds that the State has proven by a preponderance of the evidence that Trent's July 27 statements were voluntarily given; that Trent had a sufficient understanding of the Miranda rights; and that he knowing, intelligently and voluntary waived those rights.
Trent essentially contends that seven "other facts and circumstances" relied upon by the trial court to offset and overcome Dr. Barna's testimony were insufficient to allow the State to preponderate on the question of whether Trent intelligently and voluntarily waived his Miranda rights. We disagree. The question of whether Trent's waiver was intelligent and voluntary was essentially factual, and thus within the particular province of the trial court to resolve. While Trent would have us draw different conclusions from some of the other facts and circumstances than were drawn by the trial court, all of the other facts and circumstances find support in the evidence, and we are satisfied that the trial court acted reasonably in according to these other facts and circumstances the significance that it did.
Trent's final contention under this assignment is that the State presented insufficient evidence that the two police searches of 639 Huffman Avenue were consented to by persons authorized to give consent. The trial court addressed this issue as follows:
 The authority to consent to the entrance and search of an area protected by Fourth Amendment may be provided by a third party who possesses common authority over the premises in question. United States v. Matlock (1974), 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249.
 In the case sub judice, Det. Burke testified that on July 20, at approximately 4:00-4:15 p.m., he observed Trent injured and laying [sic] on a mattress on the floor in the front room of 639 Huffman. He testified, "we made contact finally at the door with the lady who was later identified as Angela Domm. We identified ourselves as Dayton police officers to her, asked if we could come in. She stated we could." Suppression Transcript. Burke testified that Trent said that he had been assaulted by Tavell Sims and Isaiah Smith. Burke testified that Domm presented a DPL bill for 639 Huffman with her name as customer as proof that she resided at that address. (Trent also told Burke on July 27 that "Angela Domm was the occupant, the only legal occupant of the residence . . ." Id.) Burke testified that he "went through a consent to search form" with Domm, and that she signed the form, thereby consenting to the search of 639 Huffman. Id. A police evidence crew then searched the residence for evidence of the assault upon Trent.
 On July 28, after Trent had become a suspect in the Hilsman murder, Det. Burke returned to 639 Huffman. He testified that he noticed that the owner of the property, Daisy Rogers, "had construction people there boarding up windows, some of the windows had been broken out, and boarding up the doors so no one else could get back in. And she allowed us through the front door." Id. Burke learned Domm had been evicted. Burke testified that Ms. Rogers gave written consent to search the house, and Evidence Officer Harvey Gase recovered various items containing blood.
 Neither Rogers nor Domm testified at the suppression hearing, nor were their written consents offered in evidence by the State. As a result, in his Memorandum in Support of Motion to Suppress, Trent characterizes these as "alleged" consents and Rogers as the "alleged landlord." He asserts that in the absence of consent-giver's testimony or the written consent itself, "this court cannot conclude as a matter of law" that valid consent was given. Id. In support of this proposition of law, Trent erroneously relies upon Illinois v. Rodriquez (1990), 497 U.S. 177 and State v. Reynolds (1998), 80 Ohio St.3d 670. Neither case holds that a court may not find a valid written consent based solely upon the testimony of a credible police officer.
 While the State may be criticized for its failure to introduce into evidence the written consent forms and/or the testimony of Rogers and Domm, it did present the testimony Det. Doyle Burke, whom this Court found to be a credible witness. His uncontradicted testimony provided a sufficient basis upon which to conclude, by a preponderance of the evidence, that he obtained written consents to search from Domm and Daisy, and that Domm and Daisy had authority to give consent.
 Based upon the totality of circumstances, and given that there is no evidence of police coercion or duress in obtaining the consents to search, this Court finds that the State has established by a preponderance of the evidence that the consents were voluntarily given.
The deficiencies in the State's evidence went to its weight rather than its sufficiency. The trial court found Det. Burke to be a credible witness. Accordingly, the trial court properly concluded that the two searches were consented to by persons authorized to do so.
The first assignment is overruled.
2. THE TRIAL COURT ERRED IN ORDERING CONSECUTIVE SENTENCES AS THE WITHIN OFFENSES OF INVOLUNTARY MANSLAUGHTER AND AGGRAVATED ROBBERY ARE ALLIED OFFENSES OF SIMILAR IMPORT.
The State contends, and Trent all but concedes, that this assignment must be overruled on the authority of State v. Rance
(1999), 85 Ohio St.3d 632.
This case is on all fours with Rance, and the second assignment is overruled.
The judgment will be affirmed.
GRADY, P.J. and YOUNG, J., concur.
Copies mailed to:
Kirsten A. Davies
James S. Armstrong
Hon. Dennis J. Langer