**UNITED STATES of America,**

v.

**Joseph B. RASPBERRY, Defendant.**

**No. CRIM.A.03–0413 JR.**

United States District Court,
District of Columbia.

March 16, 2004.

---

Tricia D. Francis, Assistant United States Attorney, Washington, DC, Counsel for United States.

Carlos J. Vanegas, Assistant Federal Public Defender, Washington, DC, Counsel for Defendant.

### MEMORANDUM ORDER

ROBERTSON, District Judge.

Defendant Joseph Raspberry moves to suppress physical evidence found by police officers and statements made to them during the officers' search of his residence and of a vehicle parked outside, on August 23, 2003, and the following morning. The motion [# 8] is **GRANTED.**

On August 23, 2003, Officer Spencer from the Metropolitan Police Department responded to an "unwanted guest" call from 2125 4th Street, N.W., Apartment # 414. When Officer Spencer arrived at the building, the D.C. Housing Authority security guard for the building was not present, so he proceeded directly to the apartment. When he arrived, the defendant was standing in the hallway. The defendant informed the officer that he had an unwanted guest in the apartment who was barred from the building, who had tricked her way into the apartment under false pretenses and who would not leave. With the defendant remaining outside, the officer entered the apartment and spoke with the guest, later identified as Lynette Naylor.

Ms. Naylor appeared agitated and slightly inebriated. She told the officer that she lived in the apartment and that she was the defendant's girlfriend. She also said that the defendant had assaulted her and that he had broken a key in the doorway during a struggle. Officer Spencer examined Ms. Naylor and the door and told Ms. Naylor that he saw no signs of a struggle and that Raspberry was not going

to jail. Ms. Naylor then said that the defendant had a gun in the bedroom under the bed. Officer Spencer asked Ms. Naylor for evidence that she had authority to consent to a search of the apartment because it had been reported to him that she was barred from the apartment and did not live there. She led the officer to the bathroom, where she showed him a few female toiletry items. When Officer Spencer said that was not enough, she showed him a few items of female clothing that were mixed in with defendant's neatly stacked clothing along the wall of the bedroom. When the officer said that this was still not enough, Ms. Naylor produced a piece of mail matter from the agency that distributes food stamps in the District of Columbia. This was a form letter dated July 18, 2003, and addressed to Ms. Naylor at 2125 4th Street, N.W., Apt. # 414. The officer was satisfied by this letter, because, in his experience, food stamps are the same as cash, and the food stamp agency investigates an individual's address carefully before sending them. At some time thereafter, Raspberry told the officer that he had confirmed Ms. Naylor's residence at the apartment with the food stamp agency prior to the issuance of the letter.

At that point, Officer Spencer took a chair into the hallway, where another officer, Officer Gunnels, was present. Officer Spencer handcuffed the defendant and asked him to sit in the chair because there might be more to the issue than an "unwanted guest." Officer Gunnels patted Raspberry down. Officer Spencer told the defendant that he was not under arrest, but that he was being forcibly stopped and that he had been placed in handcuffs for officer safety purposes. Officer Spencer called for police department detectives to assist him. Then, he began to look for the weapon Ms. Naylor assured him he would find. When he found nothing under the bed, Ms. Naylor directed him to a closet. When he found nothing there, she told him to look under the mattress. There Officer Spencer found a box of .380 caliber ammunition.

Sometime thereafter, two detectives, Detectives Swinson and McGee, arrived. Ms. Naylor told Officer Spencer and Detective McGee that Raspberry had two cars in the parking lot outside and that the gun might be in one of them. Detective Swinson testified that Raspberry orally consented to a search of the apartment and the two cars, both voluntarily (after hearing Ms. Naylor's loud accusations against him through the ajar apartment door as Officer Spencer was searching his apartment) and in response to the detective's questions. Officer Spencer also said that Detective Swinson told him to write up a consent for search in his notebook for Raspberry and Ms. Naylor to sign. The detectives left to search the cars while Officer Spencer got the written consents from Raspberry and Ms. Naylor. Thereafter, the detectives called Officer Spencer and told him they had found a gun, a .380 caliber Davis semi-automatic pistol, in one of the cars. Additional .380 caliber ammunition also was retrieved from a bag in the apartment's hallway closet.

1. *Ms. Naylor's authority to consent to the search of the apartment.*

 Officer Spencer took considerable care to determine whether Ms. Naylor had authority to consent to his search of the apartment. He was right to do so. "As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quoting *Ter-*

*ry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (internal quotation marks omitted)); *see also United States v. Whitfield*, 939 F.2d 1071, 1073–74 (D.C.Cir.1991). "If not, then warrantless entry without further inquiry is unlawful unless authority actually exists[; b]ut if so, the search is valid." *Rodriguez*, 497 U.S. at 188–89, 110 S.Ct. 2793. "[T]he authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (internal citations omitted).

I find Officer Spencer's testimony credible in all respects, but I find his belief that Ms. Naylor had authority to consent to the search objectively unreasonable. Officer Spencer found a few female toiletries that could have been left behind the apartment after a departure, a few articles of female clothing (not in drawers or hanging in the closet) that were mixed in with the defendant's neatly piled clothing, and a letter bearing Ms. Naylor's name and the address of the apartment.

That information, considered in the context of the "unwelcome guest" call, Ms. Naylor's agitation and inebriation, and her unreliable statements to him about a struggle, were not enough for Officer Spencer to conclude that Ms. Naylor had "mutual use" of the apartment. The letter, the key piece of information relied on by Officer Spencer in finding authority to consent, was over a month old. The officer did not ask for additional mail matter, a driver's license, or any other information that might confirm Ms. Naylor's state-

ments that she was then still residing with the defendant in the apartment.

2. *Defendant's purported authority to search the apartment and the vehicles.*

 Officer Spencer found ammunition under the defendant's bed and proceeded to forcefully detain the defendant with handcuffs. Thereafter, the defendant consented verbally and in writing to a search of his apartment and of the two vehicles outside. The question the Court must ask, therefore, is whether the defendant's oral and written consent was voluntary and sufficient to render lawful this otherwise unlawful search. "Words or acts that would show consent in some circumstances do not show it in others. 'Non-resistance to the orders or suggestions of the police is not infrequent . . .; true consent, free of fear or pressure, is not so readily to be found.'" *Higgins v. United States*, 209 F.2d 819, 820 (D.C.Cir.1954) (quoting *Judd v. United States*, 190 F.2d 649, 651 (D.C.Cir.1951)). As the D.C. Circuit explained,

> [i]f a valid confession precedes a search by police, permission may show true consent to the search. That was the situation in *United States v. Mitchell*, [322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944)], on which appellee relies. But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that when police identify themselves as such, search a room, and find contraband in it, the occupant's words or signs of acquiescence in the search, accompanied by denial of guilt, do not show consent; at least in the absence of some extraordinary circumstance, such as ignorance that contraband is present.

*Id.* As in *Higgins*, which remains good law in this Circuit, no such circumstance is

shown here. At the time he gave consent, Raspberry had three policemen attending him, was handcuffed and was sitting down outside his apartment. Accordingly, even crediting the officers' testimony, the record does not support a finding that the defendant voluntarily and freely consented to the search.