COMMONWEALTH
vs.
James BLOOD

Nos. 01360, 01361

COMMONWEALTH
vs.
Dorothy TEAGUE

Nos. 01364, 01365

COMMONWEALTH
vs.
Ernest LORENZEN

Nos. 01367, 01368

COMMONWEALTH
vs.
Walter WOODYATT

Nos. 01369, 01370

Superior Court
Commonwealth of Massachusetts

February 18, 1982

**Stephen Kiley,** counsel for plaintiff.
**Laurence J. McGuire,** counsel for defendant.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO SUPPRESS

In the above-captioned cases defendants are accused respectively of conspiracy to break and enter in the nighttime the premises of Eastern Smelting and Refining Co. on May 27, 1981, and conspiracy to commit larceny from that same alleged victim. There are also outstanding parallel indictments numbered 01356 and 01357 against Novia Turkette, Jr., who is in default.

Each defendant filed a motion to suppress the contents of recorded conversations. The participants in each conversa-

tion include one Charles Hudson, an unindicted co-conspirator, and the following persons:

5/18/81 — Lorenzen, Turkette, Jr. and Sr. (Exhibit #3 - "Kel" transmitter.);

5/26/81 — Blood and Turkette, Sr. (father of Turkette, Jr. (Exhibit #4 - "Kel" transmitter);

5/27/81 — Turkette, Jr. (Exhibit #5 - "Kel" transmitter);
— Lorenzen (Exhibit #5 - "Kel transmitter);
— Turkette, Jr., Blood and Woodyatt (Exhibit #6 - "Kel")
— Turkette, Jr. and Sr., Blood and Woodyatt (Exhibit #7 - reel to reel)

5/28/81 — Blood (Exhibit #8 - suction cup);
— Lorenzen (Exhibit #9 - suction cup).

Defendants variously attacked the recordings on the grounds that they were (1) made without a warrant; (2) without consent; (3) based on hearsay; (4) in violation of the defendants' reasonable expectations of privacy, contrary to federal law, and in violation of state and federal Constitutions; and (5) not within any exception of Chapter 272, Section 99 because of the absence of any showing that organized crime was involved and because a breaking and entering is not a designated offense.

As to defendant Dorothy Teague, none of whose statements have been recorded, an additional ground for suppression is that, as to her, all the evidence is hearsay.

The defendants have reserved questions of authenticity, relevance or materiality of the recordings to trial.

The Court heard evidence on November 20, 24, 30, December 1, 2, 3, and 8, 1981 from Massachusetts State Police Detective Lt. John Burns, Salem Police Officer Robert St. Pierre, and Charles Hudson.

The motions were argued and briefed and the Court makes the following:

## FINDINGS OF FACT

### I. Information Known to State Police Detective Lt. Burns Before Recordings.

1. Massachusetts State Police Detective Lt. John Burns (Lt. Burns)[1] first heard of Novia Turkette, Jr., sometime in 1974 as being involved in the planned holdup of Carol's Jewelry in Inman square, Cambridge. Lt. Burns participated in the stakeout, and while the robbery never occurred, Lt. Burns saw Turkette, Jr. standing across the street from the proposed target.

2. In 1979, while working on arson cases, Lt. Burns learned from an Assistant United States Attorney in Boston that an informant, Kenneth Landers, had testified against Walter Woodyatt, Novia Turkette, Jr., and Novia Turkette, Sr., all of whom had been found guilty.

3. Thereafter, in Virginia, in 1979, Lt. Burns talked with Landers about Lynn arsons and Landers mentioned Turkette, Jr. in connection with breaking and entering and the arson of Chris Pizza in Lynn, and a New Hampshire arson. Lt. Burns talked with Landers 40 to 50 times both in Virginia and in Massachusetts.

4. In March 1981; Landers testified at the trial of Charles Hudson on a charge of arson of his own house in 1979. Hudson was found guilty and held on $500 bail on a stay pending appeal. He obtained the $500 bail money from Turkette, Jr. and was to be sentenced two weeks later, but did not appear for sentencing. Instead, he stayed at the Suntaug Apartments in Saugus with Frank Strazzulo, who was also hiding from the authorities. There he met William Todd and Richard Megna. I infer Hudson later told this to Lt. Burns.

---

1. Lt. Burns started his law enforcement career as a policeman with the Somerville Police Department rising to Lieutenant. He has thereafter been ten years with the Massachusetts State Police, attached to the Essex District Attorney's Office for two years. He spent ten years in Middlesex investigating major crimes. In 1979 he worked on a series of arson cases in Lynn, Massachusetts, and I infer there first learned of Charles Hudson. By May 1981, Lt. Burns was experienced in investigating racketeering, narcotics, breaking and entering, and arson charges.

5. On April 24, 1981, Hudson was arrested by the Cambridge police while trying to break and enter a jewelry store. On April 25, 1981, Mrs. Charles (Janet) Hudson called Lt. Burns and talked with him for two hours. Lt. Burns then went to the Cambridge Police Department and talked with Hudson who decided to co-operate. He told Lt. Burns about a plan to rob Pier 4 on April 26 with Megna, Strazzulo and Todd. Lt. Burns knew Magna to be a holdup man for 10-15 years. He checked the records of all three and found that they all had extensive records. The robbery did not occur.

6. On Monday, April 27, 1981, Lt. Burns conferred further with Hudson in Topsfield, accompanied by Sergeant Sott and Janet Hudson. Hudson told the investigators about numerous criminal activities and associations including: that Hudson and Turkette, Sr. had broken into Danvers and New Hampshire Wendy's; about a breaking and entering of a jewelry store in Winthrop which Hudson had done with Robert "Dana" Brunn and a friend during the week or two before Christmas, 1980; and about 15 other breakings and enterings including a Framingham Wendy's, and several jewelry stores. Lt. Burns was able to verify a number of these burglaries through police reports.

7. Hudson described the break-in at the Wendy's in Danvers. He and Turkette, Sr. got the combination of the safe from an employee. Hudson then hid in the ceiling in the men's room until the store closed and then broke into the safe using the combination and stole several thousand dollars. Turkette, Sr. acted as lookout. Lt. Burns checked with police and verified a number of the foregoing points, including that Hudson had left a crowbar and pack of cigarettes inside the Wendy's.

8. On May 6, 1981, Lt. Burns conferred further with Hudson who told him of an arson of Strazzulo's girl friend's house on Ballard Street, Saugus.

9. Lt. Burns had several conversations with Janet Hudson during the period May 6-12, 1981. She said Frank Strazzulo had called her and wanted to contact Hudson and "the man with the box." The box was described as a "shun," (probably a shunt), a device to bypass burglar alarms, in the possession of Turkette, Jr.

10. Charles Hudson made bail on May 12, 1981 and was released from custody.

11. Lieutenant Robert St. Pierre of the Salem Police Department (Lt. St.Pierre), in mid-May 1981, told Lt. Burns that he had first heard of Turkette, Jr. in 1979 upon hearing that Turkette, Jr. was arrested by federal authorities for racketeering. Lt. St.Pierre also learned from other police officers and from reading generally that Turkette, Jr.'s method of operations was: to break in at night with others; to be back home by midnight; to use various methods to bypass alarms or, alternatively, to trigger calls to the alarm or police service; to watch police and/or people from the alarm company arrive; to then inspect the premises, and leave, not expecting the alarm to work again; and then enter the building and steal the contents.

12. Lt. St.Pierre also told Burns the following: Charles Werner, a Detective of the Peabody Police Department (Det. Werner). Det. Werner had told Lt. St.Pierre about a "box" used by Turkette, Jr. and his associates. Lt. St.Pierre learned this information from Det. Werner toward the end of April 19, 1981, in connection with an investigation that Lt. St.Pierre made into a break of Eaton's Drug Store in Salem. That break occurred on April 4, 1981, and the evidence indicated that the alarm had been tampered with, activated, police and the custodian had responded, then left, after which the door was forced and drugs were stolen. Lt. St.Pierre reasonably concluded that this fitted the methods of Turkette, Jr. Lt. St.Pierre learned from Det. Werner that he had penetrated Turkette, Jr.'s group by pretending to be a "bad cop," and using body wires and tape recordings.

13. On May 13, 1981, Hudson told Lt. Burns that he had had conversations with Turkette, Jr. on behalf of Strazzulo

because some contacts of Strazzulo wanted to use Turkette, Jr.'s "box." The group was to include Strazzulo, Richard Megna, William Todd, Robert "Dana" Brunn, and one "Louis," who drove a gray Mercedes, believed by Lt. Burns to be Louis DePietro. Strazzulo told Hudson that a "$3 million score on gold" was planned and the group wanted to see if Turkette, Jr.'s "box" was sufficiently sophisticated for the job. Hudson also reported that he had telephoned Louis. Lt. Burns checked Louis' record and found that he had a criminal record (Exhibit #1).

14. On May 12, 13 and 14 Strazzulo continued to call Hudson about making contact with Turkette, Jr., and Hudson relayed all the information to Lt. Burns, including information about a meeting at a ballpark at which "a gold score" was first discussed, and a May 14, 1981 meeting at Peabody of Megna, Strazzulo, Todd, DiPietro, and Turkette, Jr., at which it was decided that Turkette, Jr.'s "box" would not be useful.

15. Hudson also told Lt. Burns that when he, Hudson, had talked with Turkette, Jr. on the telephone, Turkette, Jr. said that he had been out all night robbing a drugstore, and that a week before Turkette, Jr., together with Greg Slaney and Skip Creamer, broke into a place in Cambridge and Eaton's Drug Store in Salem to get drugs. Lt. Burns knew that Slaney had a criminal record from talks he had had with policemen, that he had been arrested for breaking and enterings and narcotics, that he had been found guilty and was now in jail.

16. On May 14, 1971, Hudson also told Lt. Burns that he and Turkette, Jr. had discussed Hudson's looking over for a possible breaking and entering a Service Merchandise Store and a Coleman's gun store in Burlington to see if the "box" could be used. Also, that Hudson had gone with Turkette, Jr. to the locations and found that the "box" was not suitable. Hudson also relayed information that Turkette, Jr. was planning a break into a Stuart's Store in Everett on May 16, and would possibly be accompanied by James Blood. Lt. Burns advised Hudson not to participate in any such break. Hudson also told Lt. Burns that Turkette, Jr. was looking over, for possible robbery, a Malden jewelry store said to contain substantial gold products.

17. On May 14, 1981, Hudson also told Lt. Burns that Turkette, Jr. was planning a break into the Eastern Smelting and Refining Company (Eastern Smelting) on the Lynnway believed to contain several million dollars in gold; that Turkette, Jr. had previously cut the wires but had not been able to gain entry; that Turkette, Jr. Planned to recruit Lynn Police Officer "Ernie" (believed to be Ernest Lorenzen) who had charge of the detail list and would know who had been hired to be on guard duty; that James Blood was to be a participant and also one "Chico" (believed to be Walter Woodyatt). Hudson had known Lorenzen for 15 years and had "done things" with him in the past. Turkette, Jr. encouraged Hudson to participate in another robbery of this "gold."

18. At about the same time, Turkette, Jr. told Hudson of having broken into the Eaton Drug Store, cutting the wires, waiting for the authorities to check out, waiting for them to leave, and then entering the store with "Chico" (Walter Woodyatt). Hudson reported this information to Lt. Burns soon after.

19. Lt. Burns reasonably believed that recording of conversations by Hudson with Turkette, Sr. and Jr., Lorenzen and Strazzulo would produce evidence of a conspiracy to break into Eastern Smelting Co. and commit larceny.

II. The Recordings

20. On May 15, 1981, Lt. Burns met with Janet and Charles Hudson at their apartment in Lynn at which time Lt. Burns asked if Hudson would be willing to put a body wire on so that conversations about the Eastern Smelting robbery could be recorded. Hudson agreed.

21. The system to be used, known as a "Kel" transmitter, consisted of a small radio transmitter to be attached to Hudson, capable of sending signals up to 150 feet, where Lt. Burns would receive and record the transmissions in a suitcase

shaped device that he would have in his vehicle. Lt. Burns instructed Hudson on the operation of the equipment, and how to turn it on and off.

22. The first recording was made on May 18, 1981. Hudson had called Lt. Burns and said that Turkette, Jr. and Sr. were going to Hudson's house and the group was then going to Lorenzen's home to talk about the Eastern Smelting break.

23. Lt. Burns stationed himself near Lorenzen's home about 7 p.m., saw Turkette, Sr.'s van parked nearby, and overheard from Hudson's transmitter conversations among Hudson, Lorenzen, Turkette, Sr. and Jr., all of whose voices he recognized (Exhibit #3).

24. On May 20, 1981, Lt. Burns had Hudson sign a consent form retroactive to May 12, 1981 (Exhibit #2).

25. On May 26, 1981, Hudson was in the vicinity of the Osmond Hotel in Lynn and conferred with Turkette, Sr. and Blood, whose voice Lt. Burns also recognized. This conversation was recorded (Exhibit #4). During the conversation the group agreed to the breaking and entering of Eastern Smelting.

26. On May 27, 1981, Lt. Burns talked with Hudson again, who advised him that the original plan was to cut the wires on one day and do the break over the weekend. However, Turkette, Sr. was not in agreement and wanted to do the whole thing at once. Hudson also reported that the group was to include Blood, himself, Turkette, Jr. and "Chico" (Walter Woodyatt). Woodyatt was to cut the wires. Turkette, Sr. was not to participate but was to share in the loot "for his retirement."

27. At about 3 p.m. on May 27, 1981, Hudson went to the Osmond Hotel where he met Blood and then together they went to the home of Turkette, Jr. Hudson was wearing the "Kel" transmitter. Lt. Burns was nearby and recorded the conversation about the Eastern Smelting break (Exhibit #5). The group was planning the break for that night. This was later confirmed in a telephone conversation between Hudson and Lt. Burns. Hudson advised that he then planned to go to Lorenzen's house.

28. At about 5:30 p.m. Hudson went to Lorenzen's house wearing the "Kel" wire and Lt. Burns overheard and recorded a conversation between Hudson, his wife, Janet, and Lorenzen and his wife, "Vy." Lt. Burns had heard Lorenzen's voice previously, including on May 18, and recognized it. During the conversation Lorenzen agreed that when the alarm came in that he would take "the detail," which I assume means he would go to the scene (Exhibit #5).

29. At about 6 p.m. on May 27, 1981, Lt. Burns provided Hudson with a Mercury automobile which had a tape recorder strapped under the seat with a microphone near the front of the seat. He instructed Hudson on how to use it.

30. At about 7 p.m. Hudson called and advised that he was going to pick up the people for the Eastern Smelting break, including Blood, Woodyatt and Turkette, Jr. Lt. Burns then proceeded to the Eastern Smelting Company location. Hudson recorded events during the attempted robbery both through the body wire and the tape recorder (Exhibits #6 and #7).

31. Later Lt. Burns obtained the tape recording from Hudson. Lt. Burns listened to it and recognized the voices of Hudson, Blood and Turkette, Jr., and another voice that he did not recognize. Hudson stated that the other voice was of Woodyatt.

32. At 11 p.m. on May 27, 1981, Hudson told Lt. Burns that he, Hudson, had picked up Blood at the Osmond Hotel, went to the home of Turkette, Jr. and picked up Turkette, Jr. and Woodyatt. They then proceeded to Eastern Smelting, but about halfway there Turkette, Jr. said he wanted to get his girl friend's (Dorothy Teague) car because she had a police scanner. They then proceeded to Lynn, got Teague's car, and proceeded to Eastern Smelting. Blood stayed at the street as lookout, Turkette, Jr. ran alongside the building to be an additional lookout, and Woodyatt went over the roof to cut the wires. The break failed, I

infer because of police intervention arranged by Lt. Burns.

33. On May 28, 1981, Hudson told Lt. Burns that he expected to have some more telephone conversations with the participants in the attempted break. Lt. Burns told Hudson about a suction cup capable of recording telephone conversations and asked Hudson if he was willing to use it. Hudson agreed. Hudson later gave Lt. Burns the recordings of a telephone conversation he had that day with Blood and Lorenzen concerning who responded to the alarm (Exhibit #8).

34. Hudson freely and voluntarily consented to Lt. Burns making all the recordings mentioned above. There were no threats or promises, except a promise by Lt. Burns to speak on Hudson's behalf, I infer, in Court at the conclusion of any plea or guilty finding in the future.

**Conclusions of Law**

The Massachusetts wiretap statute G.L. c. 272, sec. 99, recognized that electronic surveillance posed "grave dangers to the privacy of all citizens of the Commonwealth" and authorized electric surveillance only by "law enforcement officials" in the investigation of "organized crime" when done under "strict judicial supervision." **Id.** The statute makes clear that a warrant should be obtained prior to any electronic surveillance except in a few limited and specific situations. In this case, the Commonwealth justifies its failure to obtain a warrant before proceeding to record various conversations by the exception contained in sec. 99 B(4). Defendants argue that the B4 exception does not apply and bring this motion to suppress the recordings pursuant to sec. 99P, claiming that the communications were "unlawfully intercepted."

It is not contested that the informant, Hudson, employed "intercepting device(s)" as defined in § 99 B(3), and that he recorded the "contents" of "wire or oral communications" within the meaning of § 99 B(1) and (5). Therefore, the question presented here for decision is whether or not the recordings are "interceptions" within G.L. c. 272, § 99 B(4).

General Laws chapter 272, § 99 B(4)[2], defines "interception" as secretly hearing or recording by means of an intercepting device, or aiding another to secretly hear or record the contents of any oral or wire communication. Electronic surveillance is not "interception" if (1) all parties to the communication consent in advance; (2) if the interceptor is an investigative or law enforcement officer who either (a) is a party to the communication or (b) has a party's advance authorization to record and is investigating a designated offense. The Commonwealth contends that it comes within (2) (b) above because a party to the conversation gave his consent to be recorded by police.

The Supreme Judicial Court in **Commonwealth v. Thorpe**, Mass. Adv. Sh. (1981) 1827, 1831-1837 held that in order to come under the B(4) exception the "Commonwealth should be required to show that the decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of a designated offense in connection with organized crime. The standard of reasonable suspicion is an objective one; it is met by a showing of articulable facts from which a reasonable person could conclude that interception would lead to evidence of a designated offense. Cf. **Terry v. Ohio**, 392 U.S. 1, 21

2. G.L. c. 272, § 99 B(4) provides:

The term "interception" means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein.

(1968); **Commonwealth v. Silva,** 366 Mass. 402, 405-408 (1974)." **Commonwealth v. Thorpe, supra** at 1837. Thus, the Commonwealth must prove that the police sought evidence of a "designated offense in connection, with organized crime." **Id.**

### I. Designated Offense.

The statute includes burglary in the category of "designated offenses" under § 99 B(7). The Commonwealth has charged the defendants with the statutory offense of breaking and entering in the nighttime. G.L. c. 266, § 16. The defendants apparently argue that because the elements of the statutory offense differ from the common law crime of burglary, the

statutory offense is not a "designated offense." This claim clearly lacks merit.

It would simply be too burdensome for the wiretap statute to explicity define every statutory offense to which it applies. The statute should be construed to avoid rendering its terms meaningless, **Commonwealth v. Wade,** 372 Mass. 91, 95 (1977), and the construction suggested by the defendants would effectively render void the common-law offenses listed in the statute, **e.g.,** larceny, burglary. Moreover, the elements of the common law crime of burglary are "breaking and entering of the dwelling of another in the nighttime with the intent to commit a felony therein." Nolan, **Criminal Law,** § 401 at 232 (1976). This is closely related to the statutory offense charged here. See, G.L. c. 266, § 16. Therefore, the Court finds that the statutory offense of breaking and entering in the nighttime as outlawed by G.L. c. 266, § 16 is a "designated offense" within § 99 (B)7.

### 2. Organized Crime

The statute describes organized crime in the preamble as "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." **Commonwealth v. Thorpe, supra** at 1833. The Commonwealth has met its burden of proof on this issue. Before wiretapping the police possessed considerable

evidence that "highly organized and disciplined" groups worked together over a period of time and engaged in burglaries that displayed a particular pattern. Compare, **Thorpe, supra** at 1837 with **Commonwealth v. Jarabek,** Mass. Adv. Sh. (1981) 1849, 1852-1853. Cf., **United States v. Campanali,** 518 F.2d 352, 363 (9th Cir. 1975) (organized crime requires proof of continuity plus a relationship which amounts to a pattern of activity, not sporadic activity).

First, the police had evidence from an informant, Hudson. I find the information given police by Hudson to be credible and the evidence, taken as a whole, to be reliable.[3] The "two-pronged" test of **Aguilar v. Texas,** 378 U.S. 108, 114 (1964) requires that the police relate "[1] some of the underlying circumstances from which the informant concluded that [criminal activity took place where he said it did] and [2] some of the underlying circumstances from which the officer concluded that the informant ... was 'credible' or his information 'reliable'." **Commonwealth v. Alessio,** 377 Mass. 76, 79 (1979), quoting **Aguilar v. Texas, supra** at 114.

---

3. The Supreme Judicial Court in **Thorpe, supra** at 1837, cites two "stop and frisk" cases as illustrative of the standard of "reasonable suspicion" when police determine whether or not organized crime is involved. This standard is less stringent than the standard of probable cause necessary to obtain a warrant. Compare **Terry v. Ohio, supra,** with **Aguilar v. Texas,** 378 U.S. 108, 114 (1964). However, in the instant case, the police relied on information from an informant and the reliability of the informant's information generally test the sufficiency of a search warrant. Therefore, while the Court is mindful of the fact that the standard in this case should be "reasonable suspicion," I refer to probable cause cases. See, **Adams v. Williams,** 407 U.S. 143, 145-146 (1972); **Commonwealth v. Ferrara,** Mass. App. Ct. Adv. Sh. (1980) 1241 (rescript opinion). I find that the police in this case even had sufficient evidence to meet the higher probable cause standard.

Hudson related specific information about a number of conversations with persons who had long criminal records. He told detailed facts about their methods of operation. He revealed that these groups intended to commit particular burglaries on given dates. This evidence is sufficient to satisfy the first "prong" of the **Aguilar** test. Certainly "a reasonably prudent man in the policeman's position would be warranted in the belief," **Commonwealth v. Silva,** 366 Mass. 402, 406 (1974), that the crimes that the informant disclosed would occur. The fact that the Pier 4, Service Merchandise and Coleman's robberies never materialized does not significantly lessen the credibility of the informant where he related a number of burglaries which did occur and his information about the group and their methods of operation were verified by Lt. St. Pierre.

Hudson told police about a number of burglaries that Lt. Burns confirmed through police reports. This verification indicates reliability. "The demonstrated reliability of an informant on matters other than the case before the court is, of course, relevant to the determination of the reliability of the informant." **Commonwealth v. Alessio, supra** at 81. The fact that this information implicated Hudson adds substantial weight to the credibility of the information. **Commonwealth v. Vynorius,** 369 Mass. 17, 21 (1975).

Second, the police had information independent of the informant that Novia Turkette, Jr., was involved in burglary, arson and receiving stolen property and that he and a group of others, including Hudson, intended to rob Eastern Smelting. These officers' suspicions must be "based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officers's experience." **Commonwealth v. Silva, supra** at 406.

Det. Werner and Lt. St. Pierre had information that Turkette, Jr., was currently engaged in criminal activities on the North Shore. Investigation into a robbery of Eaton's Drug Store in Salem indicated Turkette, Jr.'s, method of operation. In addition, this corroborated the information supplied by Hudson.

Viewing all the facts and inferences available to the police at the time they decided to seek Hudson's consent to record his conversations, I find that it was reasonable to suspect that the group intended to rob Eastern Smelting. See, **United States v. Cortez,** 449 U.S. 411, 417-418 (1981); **Commonwealth v. Thibeau,** Mass. Adv. Sh. (1981) 2401, 2402-2403. The Commonwealth has met its burden of proving "organized crime."

### 3. One-Party Consent

Defendants argue that law enforcement officers did not record the communications but rather a private party, the informant, recorded the communications without the consent of the other parties to the communication and thus said communications were "unlawfully intercepted." The Commonwealth counters that the recordings were made at the direction of law enforcement officers and thus fall within the § 99 B(4) exception.

The statute prohibits private individuals from secretly recording wire or oral communications unless all parties give their consent. It provides only one exception to full consent for obtaining a warrant: if a law enforcement officer records the conversation and "the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party...." G.L. c. 272, § 99 B(4). The Massachusetts statute is more restrictive that the federal statute in this regard. Federal law provides that a "person acting under color of law" may intercept communications if he is a party or has consent of a party to the communication. 18 U.S.C. § 2511 (2) (c). Thus, a private individual may intercept communications at the direction of federal authorities. However, this so-called "one-party consent" exception in Massachusetts applies to "law enforcement officers **only,** authorizing them to conduct warrantless electronic surveillance when they were party to the communication or had been

given authority by one who was." **Thorpe, supra** at 1836 n.7. (emphasis supplied). See 1968 House Doc. No. 4875.

The special state commission created to investigate electronic eavesdropping felt strongly that wiretapping by private individuals should be prohibited absent knowledge by all the parties to the conversation of the recording. "[T]he Commission has revised the present Massachusetts statute to strictly forbid electronic eavesdropping or wiretapping by members of the public...The Commission is of the opinion that wiretapping other than by law enforcement officers should be strictly prohibited." 1968 Senate Doc. No. 1132 at 6-9; see, **Commonwealth v. Jackson,** 370 Mass. 502, 507 (1976). While the special commission sought to impose a strict two-party consent requirement, 1968 Senate Doc. No. 1132, several other factions in the legislature including Governor Volpe preferred one-party consent. See, 1968 Senate Doc. 355; 1968 House Doc. No. 3665; 1968 House Doc. No. 3797. The House Committee on the Judiciary reached a compromise position with the B(4) exception for law enforcement officers. 1968 House Doc. No. 4875. The Court observed in **Thorpe** that "[t]he greater power thus accorded police and other law enforcement officers is partially offset by the requirement, not present in the commissions's proposal, that the statute be limited to investigation of "offenses in connection with organized crime as defined in the preamble." **Thorpe, supra** at 1836 n.7. The legislature obviously was concerned that private parties not be permitted to intercept conversations without permission and provided only a narrow exception to the warrant requirement for law enforcement officers. The issue here presented is whether the informant himself or the law enforcement officer "recorded" the communications within the meaning of the statute.

I find that the communications intercepted through the use of the "kel kit" were "recorded" by a law enforcement officer [Exhibit #3-6]. Lt. Burns listened to the conversations and operated the machine that recorded them. The informant merely wore the body wire. This is not sufficient to conclude that the informant "recorded" the conversations where the police monitored the communication. The communications recorded by the "kel kit" fell within the B(4) exception and will not be suppressed.[4]

The reel-to-reel recording made in the car [Exhibit #7] and the two telephone recordings made by suction cup [Exhibit #8 and 9], however, cross the line. These communications were not "recorded" by the law enforcement officers and therefore were "unlawfully intercepted" and must be suppressed. The private individual had complete control over these recording devices. The police had no control over what conversations were recorded. They did not monitor the conversations to be sure that they were related to the designated offense or that the parties involved were involved with organized crime. The police did not have continuous possession of the tapes themselves, so they could not be sure that they had not been altered or tampered with. These recordings thus lose all the indicia of reliability that were carefully built into the B(4) exception for law enforcement officers. Under the statute the police may not authorize a private party to secretly record conversations merely by telling him to "turn it on when the conversations refer to crime."

### 4. Constitutionality

Defendants bring a claim that the recordings violate the federal Constitution but it is clear that they do not.

---

4. It should be noted that the Court did not listen to the contents of the recordings to ensure that "evidence of organized criminal activity [would not be] gathered from the warrantless surveillance itself." **Thorpe, supra** at 1834. Thus, I do not know whether or not there are gaps in the recordings caused by the informant turning on and off the transmitter. However, if the recordings do contain gaps, this goes to their weight, not to their admissibility since each segment complies with the statute.

Thorpe, supra at 1838, and citations therein. Defendants also claim that these warrantless interceptions violated their right to be free from unreasonable searches and seizures under art. 14 of the Massachusetts Declaration of Rights.

The Court recognizes that it is "not bound by Federal decisions, which in some respects are less restrictive than our Declaration of Rights." Corning Glass Works v. Anne & Hope, Inc. of Danvers, 363 Mass. 409, 416 (1973). Cf. Moe v. Secretary of Administration & Finance, Mass. Adv. Sh. (1981) 464, 481-491 (Massachusetts Declaration of Rights affords greater protection of a woman's right to abortion than Federal Constitution). Nonetheless, the Supreme Judicial Court in Thorpe, upheld a warrantless consensual interception under the state constitution.

The Court in Thorpe enunciated the standard that "the nature of the particular form of warrantless surveillance and its likely impact on the individuals' sense of security...must be assessed to determine whether that type of electronic surveillance would have a chilling effect on First Amendment values." Thorpe, supra at 1840-1841. The Court stated that a person assumes the risk when speaking to a police officer that the conversation may be recorded. Thorpe, supra at 1841. In the instant case, however, the defendants spoke to a friend who had, unknown to them, become an informant. While this is a greater intrusion on their right of privacy, the Court in Thorpe found that the B(4) exception protects against the possibility of a "chilling effect" because it requires that "any interception by police [must] be based on a reasonable suspicion that interception will disclose or lead to evidence of a designated offense in connection with organized crime." Thorpe, supra at 1842.

Therefore, I find that there was no violation of art. 14 where police possessed a reasonable suspicion that the defendants were "organized crime" and they intended to burglarize Eastern Smelting.

5. Dorothy Teague

Lastly, defendant Teague argues that the contents of the recordings must be suppressed as to her because it is merely hearsay. This claim lacks merit.

The task of the Court at this point is not to decide on the admissibility of the evidence at trial but only whether there was reasonable suspicion to make the recordings. Hearsay objections are not normally ruled on in advance of trial. In suppression motions the rules of evidence do not apply in full force, United States v. Matlock, 415 U.S. 164, 172 (1974); McCormick on Evidence § 53, p. 122, n.9; 36 Yale Law Journal 1101 (1927); Wigmore on Evidence § 1385; Commonwealth v. Young, 349 Mass. 175, 178 (1968); Commonwealth v. Lehan, 347 Mass. 197, 206 (1964).

## ORDER

Therefore, the defendants' motions to suppress Exhibits #3, 4, 5 and 6 are hereby DENIED. The motions to suppress Exhibits #7, 8 and 9 are GRANTED.

By the Court,

**Robert J. Hallisey,**
**Justice of the Superior Court**