Kevin CALDWELL, Appellant,

v.

STATE of Indiana, Appellee.

No. 49S00–9009–CR–582.

Supreme Court of Indiana.

Dec. 17, 1991.

Walter E. Bravard, Jr., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Indianapolis, for appellee.

KRAHULIK, Justice.

Defendant–Appellant Caldwell was convicted by a jury of murder as well as of obstruction of justice and was sentenced to a total of 63 years imprisonment. He raises two issues for our review on this direct appeal:

(1) Whether sufficient evidence exists to sustain the convictions, and

(2) Whether the trial court properly admitted evidence discovered during the search of a motel room incident to the

defendant's arrest and subject to verbal consent of a co-occupant.

In the early morning hours of June 13, 1988, Indianapolis police were called to the parking lot of the Caddy Shack Lounge. There, in a black Thunderbird automobile, they found the body of Sharon Turner. Turner had been shot four times. Caldwell and Turner were not strangers. They were co-workers and friends. It was well known to Turner's family that before her death, she was attempting to raise money to purchase Caldwell's car. Her father testified that she kept the money beneath her mattress, and that this money was missing after her body was discovered.

A few days before Turner's death, Caldwell phoned his ex-wife, Sylvia Williams, and asked if she knew anyone interested in selling a gun. Williams contacted Caldwell later and informed him that a .22 caliber handgun was available. Caldwell gave $30 to Williams and her brother, Bobby Wade, placed the gun in Caldwell's car.

Kimberly Anderson, Caldwell's girlfriend, testified that on June 12th she and Caldwell bought food from a local restaurant and rented a room in a hotel. Anderson testified that she fell asleep while the two were watching television. She stated that Caldwell was there both when she fell asleep and again in the morning when she awoke, but she could not say whether he left during the night.

Anderson's testimony was that Caldwell later revealed to her that Caldwell did, in fact, leave Anderson that evening. According to Anderson, Caldwell admitted to her that in the early morning hours of June 13th, he arranged to meet Turner. The two drove to Wes Montgomery Park. Caldwell propositioned Turner and suggested that she get into the back seat of the car. She complied. Caldwell, however, remained in the front seat of the car and from there shot Turner four times. Caldwell drove the car back to the Caddy Shack Lounge and parked it in the Lounge parking lot. He wiped the car clean of fingerprints and then went to a nearby restaurant for a soft drink. Caldwell tossed the car keys into some bushes and returned to the motel room. Anderson further testified that she found Caldwell that morning "pale" and "just staring".

On the morning of the 13th, after Caldwell and Anderson returned to their respective homes, but before the news of Turner's murder was published in the press, Caldwell telephoned Anderson asking that she drive him to Turner's home because he had heard she had been murdered. Anderson also testified that Caldwell began to act suspiciously and that she had begun to believe that Caldwell had committed the crime. At one point she confronted Caldwell, who, pointing a pistol at her head, said, "keep on, I'll do you like I done Sharon."

During the course of the investigation, Caldwell approached Detective Stephen De-Board and asked several questions about the investigation, most specifically whether a suspect had been found in the case. In August of 1988, DeBoard issued a warrant for Caldwell's arrest on unrelated charges. Upon learning that Caldwell could be found in a local motel, DeBoard proceeded to the motel without a search warrant. DeBoard knocked on the door, identifying himself as a police officer. Anderson testified that at that time, Caldwell jumped out of bed, grabbed his pants, ran into the bathroom, and a few moments later returned and opened the door, still nude. Caldwell was arrested and removed from the motel room. Anderson was allowed to stay in the room. A police officer asked Anderson's consent to search the room, and she acquiesed. During the search, the officer noticed that tissues were balled and stuffed in an unusual manner into a dispenser in the wall. He removed the tissues to reveal a .22 caliber handgun. A ballistics expert with the Indianapolis Police Department testified that one of the bullets removed from the body of Sharon Turner had been fired by that revolver.

While Caldwell was in jail awaiting trial, he wrote Anderson and convinced her to write a letter confessing to the murder. Caldwell drafted the letter, and asked Anderson to rewrite it in her own handwriting. She complied and sent the letter back

to Caldwell. He gave the letter to his attorney who, in turn, gave the letter to the prosecutor. Caldwell also offered Anderson money to "take the Fifth" and prepared affidavits for Caldwell to give to Sylvia Williams and Bobby Wade. He offered Williams $1,000 for her signature. Williams and Wade testified that facts in the proposed affidavits were false. Initially, Anderson was also charged with murder. This charge was dismissed, however, pursuant to a plea agreement in which she pled guilty to a charge of obstruction of justice and agreed to testify against Caldwell.

## I. *Sufficiency of the Evidence*

 The defendant's charge of insufficiency of the evidence is premised upon his argument that the only connection between Caldwell and the murder was the testimony of his former co-defendant, Anderson. Caldwell concedes that a criminal defendant may be convicted based solely upon the testimony of an accomplice. *Coleman v. State* (1975), 264 Ind. 64, 67, 339 N.E.2d 51, 54. The fact that the accomplice was granted a benefit by the State in order to encourage such testimony, the defendant admits, goes to the weight of the testimony and not the accomplice-witness's competency. Caldwell argues, however, that due to the inherently suspect nature of testimony given by an accomplice, it is essential that the terms of any deal struck between the accomplice-witness and the State must be fully divulged to the jury such that they can adequately assess the weight of the witness' testimony. *See, Adler v. State* (1967), 248 Ind. 193, 197, 225 N.E.2d 171, 173; *Newman v. State* (1975), Ind., 263 Ind. 569, 334 N.E.2d 684. Although Caldwell correctly states the law, he is incorrect in his accusations that the jury in this case was not fully apprised of the agreement struck between the prosecutor and Anderson. The record reveals that the jury was fully aware that murder charges originally had been brought against Anderson. Her confession, the recanting of that confession, her conviction on charges of obstruction of justice, and even the signed plea agreement entered into by Anderson were all presented to the jury.

Caldwell also argues that although the plea agreement was entered into evidence, the jurors, in their lay capacity, were unable to appreciate the benefits that the witness expected to receive in exchange for her testimony or the nature of the danger that she faced prior to entering into this agreement. Despite the fact that members of a jury are typically without degrees in law, they are certainly competent to understand the difference between being convicted of murder and being convicted of obstruction of justice, which they were told was a class D felony. The jury was sufficiently informed of the agreement between Anderson and the State to adequately assess her truthfulness and veracity. It was the jury's duty to accept or reject her testimony based on this assessment.

 Anderson's testimony notwithstanding, the evidence presented in this case was sufficient to sustain Caldwell's conviction. Sylvia Williams' testified that she sold a .22 caliber handgun to Caldwell two days prior to Turner's murder. Bobby Wade testified that he completed this sale by placing the .22 caliber gun in Caldwell's car. The gun, identified by Wade, was found in Caldwell's motel room. Balistics experts testified that the gun found in the room was used to murder Sharon Turner. The trial record reveals that Caldwell arrived at Turner's home because he had heard Turner was murdered prior to the time that the murder was publicized. Additionally, Caldwell had attempted to obtain from Detective DeBoard information regarding the progress of the investigation and had solicited Anderson, Williams and Wade in an attempt to have them sign false affidavits regarding the facts surrounding the murder. Sufficient corroborating evidence exists to affirm these convictions.

## II. *Legality of the Motel Room Search*

The second error raised by Caldwell concerns the search of the motel room that revealed the murder weapon. Caldwell charges that his constitutional and statutory rights were violated when the trial court judge failed to suppress evidence ob-

tained as a result of a warrantless entry and search by police. He alleges that the police also failed to obtain proper informed consent from any person authorized to allow a search.

 When a search is conducted without a warrant, the State bears the burden of justifying the search by proving that one of several exceptions to the warrant requirement applied. In this case, the State argues that the search was legal because it was conducted subject to Anderson's consent. Defendant responds that Anderson could not properly consent to the search of the room because the room had been rented by Caldwell in Caldwell's name.

Generally, warrantless searches are prohibited by the Fourth Amendment. Such restrictions are not applicable, however, when voluntary consent has been obtained, either from the individual whose property is to be searched, *see Schneckloh v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, or from a third party who possesses common authority over the thing to be searched, *see U.S. v. Matlock* (1974), 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242. "Common authority ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7.

Caldwell rented the room in his name. He invited Anderson to stay with him. By consenting to Anderson's access to and use of the room, Caldwell created in Anderson a legitimate expectation of privacy. *Jones v. U.S.* (1960), 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697, 706, *overruled on other grounds United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Anderson possessed the requisite common authority necessary to give valid consent to search the room. Because consent was properly given in this case, a warrantless search of the room was not improper. Consequently the evidence was not tainted and it was not error to allow its introduction into the trial.

The jury heard and saw the witnesses, examined the exhibits, received proper legal instructions and returned its verdict of guilty. No legal error having been demonstrated, the judgment entered on that verdict is hereby affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.