UNITED STATES of America,

v.

Mark NICOLETTI and Philadelphia
Suburban Development
Corporation.

Crim. A. No. 94–211.

United States District Court,
E.D. Pennsylvania.

Nov. 23, 1994.

Ewald Zittlau, Philadelphia, PA, for plaintiff.

A. Charles Peruto, Thomas Colas Carroll, Philadelphia, PA, for defendants.

## MEMORANDUM

BARTLE, District Judge.

Defendants, Mark Nicoletti and Philadelphia Suburban Development Corporation, have been indicted for violations of asbestos emission and work practice standards pursuant to 42 U.S.C. §§ 7413(c)(1), 7412(d), 7412(f)(4), 7412(h) and related federal regulations.

Before the court is a pretrial motion of the defendants to suppress evidence pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure on the ground that no warrant for a search and seizure was obtained as required under the Fourth Amendment to the Constitution. The court held an evidentiary hearing on November 18 and 21, 1994.

## I

The court makes the following findings of fact. Richard W. Newton, a pollution control officer employed by the City of Philadelphia (the "city"), has responsibility for, among other things, inspecting property for friable asbestos which is a known carcinogen. At approximately 1:15 p.m. on Friday, May 15, 1992, Mr. Newton was advised by his office that it had received a complaint that material containing asbestos was being thrown out of the windows of an unoccupied warehouse building at 301 East Chelten Avenue in the Germantown section of Philadelphia. He later learned that the complainant was Kirk Lawson, who had provided information about asbestos removal at the site on two previous occasions within the previous month or so. Mr. Newton had investigated both complaints.

When Mr. Newton arrived at the building, he himself observed pipes containing bits of asbestos being ejected out of its windows. In response to a question posed to the men he saw working on the property, Mr. Newton was directed to Mr. Raymond Huggins as the person in charge. Mr. Huggins was an independent contractor engaged by Philadelphia Suburban Development Corporation, the building owner, to remove pipe. He had a truck on the premises which had a legend on it which read "Raymond Huggins Scrap Iron and Metal Pick-up."

At about 2:00 p.m., with Mr. Huggins' oral permission, Mr. Newton entered the building. Mr. Huggins accompanied Mr. Newton as Mr. Newton inspected all three floors. Many of the windows in the building were open. Mr. Newton saw what he believed from his experience to be piles of asbestos in the stairwell and on the floors in a friable or flaking condition. According to Mr. Newton, friable asbestos can easily become airborne and poses serious health hazards. In addition, some workers were tearing up flooring and creating dust. Asbestos was also being swept up. Mr. Newton believed the conditions to be dangerous due to the friable asbestos and advised the workers to leave for their own safety, but none did. Since he was not wearing a respirator or other protective clothing, he remained in the building only about ten minutes.

After departing, he went up the street and called his supervisor to bring a camera so that he could take pictures of his observations. He also wanted to take samples to be analyzed by a laboratory to determine if city asbestos regulations had been violated.

Mr. Newton waited near the building until his supervisor arrived with the necessary equipment. Upon his arrival at about 4:20 p.m., however, he directed Mr. Newton not to enter the building until the police arrived. At about 5:00 p.m., two FBI agents and two Philadelphia police officers, who were part of a joint environmental crimes task force group, appeared on the scene. At this time, Mr. Huggins was still throwing pipe with pieces of asbestos out of the warehouse windows as he had been doing early in the afternoon. However, all the other workers, who had been involved in removing flooring, had already left.

One of the FBI agents, Denise Day, asked Mr. Huggins who was in charge of the building. Mr. Huggins replied that he was and that he had a key to the gate allowing him

entry. He also explained to her that Philadelphia Suburban Development Corporation owned the building and that he was hired to remove pipe by Mark Nicoletti on behalf of the corporation. Although he displayed Mr. Nicoletti's business card, which showed his telephone number and the company's address, neither the FBI agents, nor the Philadelphia police, nor Mr. Newton made any effort to contact the owner.

Agent Day presented Mr. Huggins with a preprinted consent form to allow entry without a search warrant. She reviewed it with him. At about 5:30 p.m., Mr. Huggins signed the form which authorized the agents "to take from my premises any photos which they may desire." Stricken from the form was permission to take "letters, papers, materials or other property." Mr. Newton and the two Philadelphia police officers entered the building thereafter at about 6:15 p.m. All three wore a respirator and protective clothing. As it was getting dark, Mr. Newton wanted police protection as he went through the structure. Mr. Newton, because of health concerns, was anxious to remove immediately anyone inside and to close the windows to prevent friable asbestos from contaminating the outside air. Both the police and Mr. Newton closed the windows to prevent the asbestos from being blown into the atmosphere and took photographs of the interior and exterior of the building. They found no one in the building, all the workmen having previously left. Mr. Newton also took samples of what he saw in plain view and believed to be friable asbestos. Neither FBI agent on the premises ever entered the building. Before the authorities left the premises, the building was posted as an asbestos hazard.

The samples were forwarded to the laboratory on Friday, May 15, 1992. The report came back positive for asbestos the following Monday. Thereafter, citations for violation of the Air Management Code of the City of Philadelphia were issued to Philadelphia Suburban Development Corporation and to Mark Nicoletti. The citations were delivered to the offices of Philadelphia Suburban Development Corporation at 700 Packer Avenue in Philadelphia.

## II

The Fourth Amendment to the Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As the Supreme Court has explained, the Fourth Amendment's guiding principle is that "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967) (citations omitted). The warrant must be issued by a "neutral and detached magistrate." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). The purpose behind the Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara,* 387 U.S. at 528, 87 S.Ct. at 1730. While a warrant is normally required to search and seize a person's property, the Supreme Court has recognized that exceptions exist "in certain carefully defined classes of cases." *Id.*

The government argues that both the first and second searches on May 15, 1992 were valid without a warrant because the authorities had the consent of Raymond Huggins who was working on the premises at the time. The Supreme Court has declared in numerous cases that proper consent to a search eliminates the need for a warrant. The consent to search, for example, may be given by any joint owner of the property. Under certain circumstances, a third party consent is valid as to a nonconsenting party even though the third party has no ownership interest in the property. In *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974), the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent,

nonconsenting person with whom that authority is shared."

The Court went on to explain:

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

In *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990), the Supreme Court applied an objective standard in determining whether the consenting party had authority to give consent to a search. The Court stated:

As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? ... If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Id.* at 188–89, 110 S.Ct. at 2801 (citations omitted).

■ In this case, I find that Raymond Huggins did not have actual authority to consent to a search of the building at 301 East Chelten Avenue owned by the Philadelphia Suburban Development Corporation. He was simply a one person independent contractor engaged to remove pipe from the building. He was compensated for his work by selling the scrap metal. While he had a key to the gate in the fence to enter and exit the property with his truck, he had authority only to remove the pipe and nothing more. Mr. Huggins testified at the hearing that he had no actual authority beyond the removal of the pipe. He had no ownership interest in the premises searched.

The court also finds that under the objective standard in *Rodriguez,* 497 U.S. at 188, 110 S.Ct. at 2801, the facts available to the officer at the moment of the search would not warrant a person of reasonable caution in the belief that Mr. Huggins had authority over the premises such that he could consent to a search. He was working by himself removing pipe and loading it onto his truck which contained the legend "Raymond Huggins Scrap Iron and Metal Pick-up." He told the FBI agents prior to the search that he had been engaged for this limited purpose only. He further told them that the building was owned by Philadelphia Suburban Development Corporation and that the contact person was Mark Nicoletti. He even went so far as to show the FBI the business card of Mark Nicoletti. The authorities, however, made no effort to contact Philadelphia Suburban Development Corporation or Mark Nicoletti before entering the building. While Mr. Huggins signed a preprinted consent form presented to him by the FBI agents, the agents knew or should have known that he had limited education and had difficulty reading. In any event, the government cannot establish consent by such a document when the person signing it has no authority to do so. Having observed Raymond Huggins on the witness stand and having heard his testimony, the court finds that no person of reasonable caution could have believed that he had authority to consent to either search of the building in question. *See Rodriguez,* 497 U.S. at 188, 110 S.Ct. at 2801.

■ Although Mr. Newton did not have appropriate consent, we must determine whether the first search without a warrant was valid on other grounds. Mr. Newton, as a City of Philadelphia pollution control officer, has responsibility for investigating complaints related to and for assuring administrative compliance with the city's Air Management Code. In this capacity, he followed up on the complaint about activity at 301 East Chelten Avenue on May 15, 1992. While the Supreme Court has held that the Fourth Amendment applies to administrative

searches, it has excused the need for a warrant where "there has been a citizen complaint or there is other satisfactory reason for securing immediate entry." *Camara,* 387 U.S. at 540, 87 S.Ct. at 1736. The parties have cited no case, and we have found none, where a citizen complaint alone, regardless of its nature, is sufficient to allow a warrantless administrative search.[1] Here, Mr. Newton not only was aware of a citizen complaint about asbestos, but upon arriving at the building, he himself observed pipes containing asbestos being cast out of the windows. From his experience and training, he reasonably believed a potentially serious and immediate health hazard from friable asbestos existed. He clearly had "a satisfactory reason for securing immediate entry." His entry into the building in the early afternoon without a warrant did not violate the defendants' rights under the Fourth Amendment. *See Camara,* 387 U.S. at 539, 87 S.Ct. at 1736.

■ The second search conducted by Mr. Newton and two Philadelphia police officers, beginning at 6:15 p.m., was also proper. Even if this search could be considered to be of a criminal nature because Mr. Newton was accompanied by police officers, an emergency existed which justified the warrantless entry. The windows in the building needed to be closed immediately in order to prevent friable asbestos from escaping from the building and harming persons in the surrounding neighborhood. If anyone was in the building, it was critical to remove him or her. A "compelling urgency" existed which demanded that Mr. Newton reenter the building in order to protect the public from the hazards of escaping asbestos fibers. *See Camara,* 387 U.S. at 539, 87 S.Ct. at 1736.

*Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), also supports the propriety of the second search. In *Tyler,* a building was damaged by fire which was thought to have been caused by arson. 436 U.S. at 501–02, 98 S.Ct. at 1945–46. The fire chief had conducted an initial search when the fire was beginning to subside to smoldering embers. *Id.* The search was discontinued because of smoke and steam. *Id.* at 502, 98 S.Ct. at 1946. Four hours after fire fighters had left and the fire had been extinguished, the fire chief and assistant chief reentered the premises without a warrant. *Id.* at 502, 98 S.Ct. at 1946. During this search, they removed pieces of carpet and stairs which allegedly evidenced arson. *Id.* The Supreme Court found that this second search was valid as merely a continuation of the first search. *Id.* at 511, 98 S.Ct. at 1950–51. Additionally, the Supreme Court held that these officials did not need a warrant "to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* at 510, 98 S.Ct. at 1950. The Court noted that a break in the investigation for a few hours was not critical because fire officials' duties include not only putting out fires but determining the causes of the fires and because "[i]mmediate investigation may also be necessary to preserve evidence from intentional or accidental destruction." *Id.*

Likewise, Mr. Newton's second search was merely a continuation of the first search. He left the building only because of the extent of the health risk. He remained close to the scene before reentering the building. Before conducting a more thorough search of the building, he wanted to put on his safety suit to avoid exposure to the friable asbestos, to obtain a camera, and to have the benefit of police protection. Mr. Newton was doing his job to investigate and contain hazardous asbestos, and to take steps to avoid any destruction of evidence. For these reasons, *Tyler* supports the propriety of the second search.[2]

---

1. We are not dealing here with a search of a "closely regulated" business. *See New York v. Burger,* 482 U.S. 691, 703, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601 (1987).

2. This matter is more analogous to *Tyler* than to *Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477, *reh'g denied,* 465 U.S. 1084, 104 S.Ct. 1457, 79 L.Ed.2d 773 (1984). In *Clifford,* a plurality of the Supreme Court suppressed a sec-

ond search conducted at a home which had been on fire. 464 U.S. at 298, 104 S.Ct. at 649. The plurality distinguished *Tyler* by noting that it involved a continuation of an earlier search. *Id.* at 296, 104 S.Ct. at 648. The search at issue in this matter is similar to *Tyler* in that it was a continuation of the first search conducted by Mr. Newton. Moreover, *Tyler* entailed a commercial establishment (a furniture store) as does the case

We next turn to the issue whether Mr. Newton's seizure of asbestos samples during the second search was permissible. In *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990), the Supreme Court established the three conditions necessary to permit seizure of an object under the plain view doctrine. First, it is necessary that the officer not have violated the Fourth Amendment in being located where the evidence was in plain view. *Id.* at 136, 110 S.Ct. at 2307–08. As explained above, Mr. Newton was properly in the building during the second search. Second, the object must be in plain view and "its incriminating character must also be immediately apparent." *Id.* (internal quotation marks and citations omitted). Mr. Newton was familiar with friable asbestos and reasonably believed that the asbestos he saw in the building violated the Philadelphia Air Management Code. Third, the officer "must also have a lawful right of access to the object itself." *Id.* at 137, 110 S.Ct. at 2308. Mr. Newton was empowered by the Air Management Code to take samples. Phila.Code § 3–304(1). In sum, Mr. Newton's seizure of the asbestos samples without a warrant was lawful under the plain view doctrine.

Finally, we must decide whether the photographs taken by Mr. Newton and the separate photographs taken by the Philadelphia police must be suppressed. At the time they were taken, Mr. Newton and the Philadelphia police, wearing protective clothing, were lawfully present in the building. Their purpose was to close windows and to remove anyone present to prevent further exposure to friable asbestos, a known carcinogen. The police were also present to protect Mr. Newton. We hold that they had the right to use a camera to record what they saw in this unoccupied commercial building. Under the circumstances, the photographs do not represent a serious intrusion into the privacy of the defendants. Indeed, in *Tyler,* 436 U.S. at 502, 511, 98 S.Ct. at 1946, 1950–51, the Supreme Court, at least implicitly, approved the taking of photographs during a warrantless

at hand while *Clifford* involved a home. *Clifford,* 464 U.S. at 296, 104 S.Ct. at 648. The Supreme Court explained that privacy interests are much

search of a store where arson was suspected. *See also Miller v. Illinois Pollution Control Bd.,* —— Ill.App.3d ——, ——, 204 Ill.Dec. 774, 782, 642 N.E.2d 475, 483 (4th Dist.1994).

The motion of the defendants to suppress evidence will be denied.

greater in a home than in a furniture store. *Clifford,* 464 U.S. at 296, 104 S.Ct. at 648.