CITY OF AKRON, Appellant,

v.

HARRIS, Appellee.

[Cite as *Akron v. Harris* (1994), 93 Ohio App.3d 378.]

Court of Appeals of Ohio,
Summit County.

No. 16474.

Decided March 9, 1994.

*Douglas J. Powley,* Chief City Prosecutor, and *Charles R. Quinn,* Assistant City Prosecutor, for appellant.

*J. Dean Carro* and *University of Akron School of Law,* Appellate Review Office, for appellee.

BAIRD, Judge.

This cause was heard upon the appeal of the city of Akron from an order of the Akron Municipal Court granting Eric D. Harris' motion to suppress evidence because the evidence was obtained after an illegal search and seizure. We reverse and remand the case for further proceedings.

On February 10, 1993, Akron police officers, Gary Shadie and Leonard Stephens, answered a call to investigate suspicious persons outside the house at 939 Hamlin Street. As they approached in their vehicle, they observed a man exit the house. When the man saw the police cruiser, he turned and immediately reentered the house. The officers were familiar with the house, knew that Eric Harris ("Harris") and his brother Michael Harris ("Michael") lived there, and had previously made several drug-related arrests at the house. The officers also knew that the Harrises had been evicted and were to have vacated the premises by February 1, 1993.

The officers approached the house and knocked on the side door. Officer Shadie testified, "I was greeted by a voice. I identified myself as 'Officer Shadie, Akron Police Department.' The subject told me to come in. It was a black male. He was standing—there's about 4 steps that lead up into the kitchen and into a dining room. I could see the figure. There were no lights on in the house. The subject told me to come in the house. At that time, myself and my partner, we entered the home." Officer Shadie also testified that he did not recognize the

voice, but he did know that the voice was not Harris' and that he "couldn't say for sure" whether the voice belonged to Michael. It was clear at the time of the hearing that the voice belonged to a third party, Tony Bowen.

After entering the house, the officers walked through the kitchen and dining room and into the living room, where they saw approximately five people, including Michael. Because of the large number of people present and the uncertainty of the situation, Officer Shadie called for backup. Michael was sitting on the couch, and Officer Shadie asked him why they had not vacated the premises and whether he knew where his brother was. Michael responded that they had obtained an extension to remain in the house and that Harris was upstairs.

Officer Stephens waited until two backup officers arrived before leaving his partner to go upstairs. Officer Stephens testified that when he went upstairs he could see Harris through an open bedroom door. Harris appeared to be sleeping and Officer Stephens shook him and flashed his flashlight in his eyes to wake him up. Once he was awake, the officer accompanied him downstairs.

Once downstairs, Officer Shadie asked Harris why he was still living in the house and what was going on there. According to Officer Shadie, Harris responded, "there's nothing going [sic] in this house. There's no drug sales or anything like that. You can look around if you like." Harris testified that he did not consent to the search until a police officer specifically asked him if it was okay to look around. The officers maintain that he offered the consent without being asked.

The officers proceeded to search the living room and found a crack pipe on a chair, push rods, and a piece of crack cocaine between the cushions of the couch. Harris was charged with permitting drug abuse (Akron City Code 138.12). A motion was filed to suppress evidence found in the search on the grounds that the entry and search of the home were unconstitutional. Following a hearing, the trial court granted the motion.

It is from this ruling that the city now appeals, asserting a single assignment of error:

"The Akron Municipal Court erred in finding that a nonconsensual search or illegal entry of the defendant's premises occurred."

The trial court identified the relevant issue in this case as "whether a visitor may admit the police to another's residence and in doing so waive the resident's constitutional rights." The court's journal entry then continued:

"While a warrantless search of private property is ordinarily unreasonable under the Fourth Amendment * * *, a number of 'specifically established and

well-delineated exceptions' to the search warrant requirement have been recognized by the courts. *Katz v. U.S.* (1967), 389 U.S. 347, 357 [88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585]. The only [exception relevant to this case] allows a warrantless search upon the voluntary consent of a third party with the authority to waive the warrant requirement and permit the entrance into the premises and a search. Therefore, if a third person who shares authority with the Defendant over the area grants permission to search, the Defendant himself need not be present or authorize the entrance. *U.S. v. Matlock* (1974), 415 U.S. 164 [94 S.Ct. 988, 39 L.Ed.2d 242]."

The court then outlined cases determining whether a person who consented to a police search had sufficient "authority over the area" or "interest in the premises" to allow evidence obtained in the search to be used against a defendant. Based upon these cases, the court concluded that "a mere visitor, who is not an overnight guest and who is without possessory interest in the premises, has no constitutional interest in the premises and may not admit the police into the premises on his or her own authority."

The court, however, noted that, even if a person did not have actual authority over the area to which consent to search was granted, the consent is still valid if the police reasonably believe that the person possesses common authority over the premises. *Illinois v. Rodriguez* (1990), 497 U.S. 177, 188–189, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148, 161. In this case, the court concluded:

"[T]he entering officers had actual knowledge that the Defendant and his brother were the only persons with a leasehold interest in the property. The police did not inquire into [the third party's] relationship to the premises before entering. [Therefore,] the police could not 'reasonably believe' that the [third party] had control over the premises sufficient to grant entry into the Defendant's home."

Therefore, the trial court granted the motion to suppress because the initial entry into the home was unconstitutionally obtained without sufficient consent, and the evidence obtained in the search of the home was tainted by the initial illegal entry.

The city argues that the trial court erred in finding that the initial entry was unconstitutional because the evidence showed that the police had a reasonable belief that their entrance was authorized. Harris argues that because the officers knew who lived in the house and knew that the person consenting to their entry was not one of the occupants, the entry was illegal, the subsequent search was tainted, and the evidence obtained was properly suppressed.

We find that the parties and the trial court have confused the relevant issue. This court has previously held that there is a distinction between consent to enter

into a residence and consent to a search of the residence. *State v. Pamer* (1990), 70 Ohio App.3d 540, 542–543, 591 N.E.2d 801, 802. In that case, we held that reliance on *Matlock, supra,* is misplaced in a case where the consent of the third party was merely to enter the premises and was not a consent to a search of the premises. We also noted that where the intent of the officers upon approaching the house was not to conduct a search, but was either to question the resident or to investigate a possible disturbance, the consent of a third party to enter the house should not be held to the same standard as the consent of a party to search the house. *Id.,* citing *Davis v. United States* (C.A.9, 1964), 327 F.2d 301. See, also, *People v. Shaffer* (1982), 111 Ill.App.3d 1054, 67 Ill.Dec. 612, 444 N.E.2d 1096 (holding that the defendant's adult brother, who was a frequent visitor in defendant's home, could permit police to enter an area where visitors would normally be received).

In this case, the officers approached the house to investigate a call regarding suspicious persons, to investigate their own observations of a suspicious male outside the house, and to question Harris. There is no evidence that the officers approached the house with the intent to search. Additionally, the officers did not ask the third person for consent to search the house; that consent came later from Harris himself. What would we have the officers do when an unseen face responded "come in" to their knocks and their identification of themselves as police officers? We find that the police officers did not err in entering the house under these circumstances.

The case can be factually broken down into two distinct parts. The first part is the officer's initial entry into the home. The second is the officer's entrance to the second floor of the home in order to find Harris, and Harris' later consent to a search of his home. The trial court's journal entry reached only the first part, holding that the initial entry was unconstitutional. Although Harris argued that the later consent was involuntary and some testimony was elicited on that point, the trial court never reached that issue. As we have found that the initial entry was legal, we reverse and remand the case to the trial court for determination of whether Harris' consent to the search was voluntary.

The city also argues that the trial court made a factual error in its journal entry, which clouded its application of the law. Harris agrees that the factual error occurred, but argues that the error was irrelevant to the court's determination. The trial court found that, after the police entered the home, they briefly searched the house for weapons and found the drugs before Harris came downstairs and consented to a search. The parties concede and the transcript of the hearing on the motion to suppress supports that this is factually incorrect. All the evidence presented, including Harris' own testimony, showed that the incident occurred as outlined above: the police entered with the consent of the

third party and talked with Michael, Harris came downstairs and consented to a search, and then a search was conducted and the contraband was found. Because we have determined that the initial entry was legal and the relevant issue is whether Harris' consent to the search was voluntary, it is evident that the trial court's factual error must also be corrected upon remand so that a proper consideration of the validity of Harris' consent may be undertaken.

The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

QUILLIN, P.J., and DICKINSON, J., concur.