OPINION
The State of Ohio appeals from the order of the Montgomery County Common Pleas Court which suppressed evidence sought to be used by the State in prosecuting Jeffrey Kilgore, the appellee herein. The facts underlying this appeal are set out in the parties' briefs and are fully supported by our review of the record.
On November 13, 1998, the City of Dayton issued a "Public Use Nuisance" notice for the apartment located at 544 East Helena Street. This apartment is part of the Dayton Metropolitan Housing Authority. Clifford Johnson, Carla Williams, Darren Chinn, and Cynthia Horne were, what is called, "nuisanced out" of the property. They were ordered not to be at the property for one year. At the option of the Use Nuisance Board, Dayton Metropolitan Housing Authority may release the apartment to others not subject to the order, or the apartment may remain vacant for that year.
On June 9, 1999, Sergeant Richard Weber of the Dayton Police Department was working an overtime investigation assignment of follow-up for public use nuisance. He was checking various locations for use nuisance violations. As part of his investigation he decided to check 544 East Helena. Sergeant Weber had no information that the four individuals who had been ordered out of the property had returned. Sergeant Weber testified that his purpose in going to that apartment was "to check to see if they were in the residence in violation of the public use nuisance law. If that was the case, they would be arrested for public use nuisance, which is similar to trespassing, but a different ordinance for the use nuisance." (Tr. 4).
Sergeant Weber, along with Officer Swisher, approached the front of 544 East Helena. Detective Nankivell approached the back of the apartment. As Weber got near the door of the apartment, he noticed that the door was open but a screen door was closed. Weber could see Curtis Miller through the screen door sitting in a chair. Weber testified as follows:
 (Weber) A. Saw a gentleman seated at a chair straight ahead of me, several feet, later identified as Mr. Miller. I again identified myself and explained what our purpose was, to see if we could check the residence for these individuals. The gentleman nodded his head and said, yes. Myself and Officer Swisher entered the residence.
Q. All right. You indicated he said that you could come in.
(Weber) A. That is correct.
Once in the apartment, the officers asked if there were others in the apartment and Miller indicated that there were two others in the apartment. It was at that time that the officers asked Miller who he was and determined that he was not one of the four that they were looking for. The officers then did a pat-down search of Miller.
The apartment was quite small, and once inside the officers were within four or five feet of the kitchen. From that location the officers observed a small bag of marijuana sitting on the kitchen table.
Sergeant Weber asked Miller if he lived there and if anyone else was present. Miller informed Weber that two others were in the apartment and that he did not live there. Weber then heard the toilet running and went down the hall to check for the other people. Jeffrey Kilgore was coming out of the bathroom and Weber stopped him and asked for his name. Defendant admitted that he lived there. Meanwhile, Officer Swisher recovered the marijuana that was on the kitchen table and informed Weber that she observed a handgun in a wide open kitchen cabinet. The handgun could be seen from almost anywhere inside the apartment. Weber then returned to the Defendant and Miller and advised them of their constitutional rights. Weber asked Defendant if he had a firearm owner's identification card, to which Weber admitted the gun was his and that he did not have an identification card. Consequently, Weber arrested Defendant for not having a firearm owner's identification card.
Officer Swisher had also noticed next to the handgun a plate containing cocaine residue. Based on this information Sergeant Weber believed there would be more narcotics, so he asked Defendant if he would be willing to sign a form consenting to a search of the apartment. Defendant agreed and signed the form. The officers searched the apartment and seized, in addition to the handgun and marijuana, the plate containing the cocaine residue, as well as some additional suspected marijuana. They field tested the residue which tested positive for cocaine. Defendant admitted to occasionally selling marijuana but he said the crack cocaine was for his personal use.
In granting the defendant's suppression motion, the trial court found there was no real or apparent authority for Curtis Miller to grant permission to the police officers to enter the apartment. The court cited Illinois v. Rodriguez (1990),497 U.S. 17 in support of its suppression order. In that case the Supreme Court held that police received "apparent authority" to enter the defendant's apartment when the defendant's girlfriend unlocked the apartment with her key.
The state argues in its single assignment of error that the trial court erred in suppressing the evidence because it was reasonable for the officers to enter the apartment based on the consent of an individual inside. The State argues that the court inappropriately applied the law regarding "consent to search" to this case.
 In Davis v. United States (CA 1964), 327 F.2d 301, the Court of Appeals held that the defendant's eight year old daughter could grant police consent to enter her home to speak to the defendant. The court of appeals held the trial court erred in suppressing marijuana found in plain view. The court emphasized the fact that the intent of the officers was not to conduct a search of the premises, but merely to question Davis.
 "***The basis of appellant's contention that the officers did not have a valid consent which would authorize their entering the premises is that the child Pamela could not have given consent to the officers to enter the home. The cases which the appellant has urged in support of this contention * * * are cases where the officers, without warrants, went to the premises for the purpose of search, and therein lies the difference between the factual situation in those cases and the facts accepted by the trial court as decisive in the case before us.
 "***When the defendant was on the stand, he made no claim that Pamela's actions in opening the door or inviting the men in was in any way unusual or unauthorized, nor did Pamela testify that the opening of the door or telling the officers to come in was against the instructions of either of her parents. From all the evidence before it, the trial court was entitled to conclude then that her opening the door and invitation to enter were not unusual or unexpected or unauthorized acts. There was no evidence that the officers, in any way, suggested or requested an invitation to enter to search the house, or either by `compulsion of authority' or by physically breaking or `barging in,' so much as even impliedly `forced' their way inside defendant's home. * * *
 "This case is distinguished from all of the cases referred to by appellant, by the entirely peaceful and invited entry into the home, with no search or intent to search in the minds of the officers upon entry. However, once legally inside the room, the officers were not required to remain blind to the obvious. * * *"
(Citations omitted). Davis, supra, 327 F.2d at 304-305.
Davis was cited with approval in State v. Pamer (1990),70 Ohio App.3d 540, where the Wayne County Court of Appeals held that the defendant's eight and thirteen year old daughters had authority to consent to police officer's entry in defendant's home, when under the circumstances, police had been called to quell domestic disturbance, discovered both parents had abandoned the children, and seeking entry police only intended to provide the children shelter while they continued to investigate. The "plain view" discovery of marijuana on a living room cocktail table was held admissible by the court.
In State v. Chapman (1994), 97 Ohio App.3d 687, the Hamilton County Court of Appeals held that warrantless entry by police officers into an apartment upon consent of a gratuitous visitor who lacked authority to admit them, was appropriate where officers heard a voice say "come in", and officers did not try to trick, threaten, or force their way into the apartment. The court rejected the defendant's claim that drugs and sawed-off shotguns should be suppressed because the police entry into the apartment was unauthorized and therefore his later consent was involuntary. Judge Bettman wrote the following on behalf of the court of appeals:
 It is undisputed that the officers were invited into the apartment by Troy, a man who the state failed to prove was anything more than a gratuitous visitor. The officers did not attempt to find out whether Troy had any kind of authority, apparent or otherwise, to let them in. It is also undisputed that Officer Ingram was already in appellant's room before Chapman gave his consent to search the premises. In analyzing this case, we believe a distinction must be made between consent to enter and consent to search. State v. Pamer (1990), 70 Ohio App.3d 540, 591 N.E.2d 801. This distinction is not always carefully made. See 3 LaFave, Search and Seizure (2 Ed. 1987) 309-311, Section 8.5(e). We also believe the purpose of the police in going to the residence must be scrutinized. Here, the officers admitted that they did not have probable cause for a search warrant, and were going to the Chapman residence merely to ask some questions.
 Turning first to the consent to enter, we find the state's reliance on Illinois v. Rodriguez (1990), 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148, to be misplaced in that the Rodriguez court held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believe to possess common authority over the premises, but does not.
 Unlike the police officers in Rodriguez, the police officers in the instant case had no knowledge about Troy at the time of entry, and made no attempt before coming in to determine whether Troy had any authority over the premises, and hence any authority to admit them. However, we agree with the court in Akron v. Harris (1994), 93 Ohio App.3d 378, 638 N.E.2d 633, that where the intent of the officers was not to conduct a search, but only to question a resident, the consent of a third party to enter the house should not be held to the same standard as the consent of a third party to a warrantless search of the house. Using a standard of reasonableness, we find nothing inappropriate about the police's entering an apartment after hearing a voice say "come in," especially where the officers immediately identified themselves as police officers and did not try to trick, threaten, or force their way into the residence. Compare, State v. Pi Kappa Alpha Fraternity
(1986), 23 Ohio St.3d 141, 23 OBR 295, 491 N.E.2d 1129, certiorari denied (1986), 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54. In the colorful words of the United States Court of Appeals for the Ninth Circuit in Davis v. United States (C.A.9, 1964), 327 F.2d 301, 304:
 "Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's `castle' with the honest intent of asking questions of an occupant thereof — whether the questioner be a pollster, a salesman, or an officer of the law." See, also, People v. Shaffer (1982), 111 Ill.App.3d 1054, 67 Ill. Dec. 612, 444 N.E.2d 1096; State v. Williams (Jan. 24, 1994), Clermont App. No. CA93-07-053, unreported, 1994 WL 18157. (Emphasis added).
In this case the purpose of the police in going to the defendant's apartment was to look or "search" for the persons who had been "nuisanced" off the defendant's apartment. Since their purpose was to conduct a search of defendant's apartment, it was not objectively reasonable for them to believe that Miller had "apparent authority" to permit them to enter defendant's apartment merely because he was present in the apartment. The State's assignment of error is overruled.
The judgment of the trial court is Affirmed.
FAIN, J., and YOUNG, J., concur.